David M. ODOM, M.D., Appellant,

v.

FAIRBANKS MEMORIAL HOSPITAL, Lutheran Health Systems, Inc., Western Health Network, Inc., James H. Gingerich, Susan McLane, Linda Smith, Ronald L. Bliss, Hoi P. Lee, M.D., Steve E. Mancill, M.D., Jerry A. Perisho, M.D., Randall K. McGregor, M.D., Lawrence W. Stinson, Jr., M.D., Anesthesia Associates, Inc., William F. Stoddard, M.D., Danny R. Robinette, M.D., Appellees.

No. S–8007.

Supreme Court of Alaska.

March 17, 2000.

David M. Odom, M.D., pro se, Fairbanks, and James Forbes, James Forbes, P.C., Anchorage, for Appellant.

Howard A. Lazar, Delaney, Wiles, Hayes, Gerety & Ellis, Inc., Anchorage, and David L. White, White, Cummings & Longino, P.C., Phoenix, Arizona, for Fairbanks Memorial Hospital, Lutheran Health Systems, Inc., Western Health Network, Inc., James H. Gingerich, Susan McLane, Linda Smith, and Danny R. Robinette, M.D., Appellees.

Leroy J. Barker, Robertson, Monagle & Eastaugh, Anchorage, for Ronald L. Bliss, Hoi P. Lee, M.D., Steve E. Mancill, M.D., Jerry A. Perisho, M.D., Randall K. McGregor, M.D., Lawrence W. Stinson, Jr., M.D., Anesthesia Associates, Inc., and William F. Stoddard, M.D., Appellees.

Before MATTHEWS, Chief Justice, COMPTON, FABE, and BRYNER, Justices.

## OPINION

COMPTON, Justice.

### I. INTRODUCTION

David M. Odom sued Fairbanks Memorial Hospital and various health care providers, asserting eleven separate claims for relief. All of Odom's claims were dismissed for failure to state a claim upon which relief may be granted. He seeks reversal on eight of the dismissed claims. We reverse the superior court's order dismissing those eight claims.

### II. FACTS AND PROCEEDINGS

David M. Odom is a licensed physician. He was employed by Fairbanks Memorial Hospital (FMH) as an anesthesiologist from 1988 until his staff privileges were terminated in 1994. FMH is the only full service civilian hospital in Fairbanks. Anesthesiologists employed by FMH enter into an agreement (Anesthesiologist Agreement) with FMH which provides that each party to the Anesthesiologist Agreement will get a pro-rated share of the anesthesia practice at FMH.

In December 1992 Odom informed FMH administrators of his intention to establish an outpatient surgery center. It was Odom's announcement of his plans to open the Fairbanks Surgery Center (FSC), in potential competition with FMH, that Odom argues precipitated the events that resulted in the termination of his staff privileges.

In October 1993 Odom refused to work with nurse anesthetist Kay Wilson. FMH suspended Odom's staff privileges for twenty-four hours and his rights under the Anesthesiologist Agreement were terminated. Unable to exercise rights under the Anesthesiologist Agreement, Odom could get an anesthesiology assignment only if specifically requested by a patient or surgeon. His pro-rated share of the anesthesia work was distributed to the remaining five anesthesiologists. In December 1993 Odom's rights under the Anesthesiologist Agreement were reinstated.

FMH continued to conduct an investigation into quality assurance issues surrounding Odom's medical practices that were raised by other anesthesiologists. A Special Investigative Committee (SIC) was formed to investigate these issues. Upon FMH's request for an opinion as to what should be done in regard to Odom's staff privileges, the American Medico–Legal Foundation (AMLF) recommended that Odom attend "extensive [Continuing Medical Education] or ... repeat a period of anesthesia residency training." SIC, however, recommended that FMH suspend Odom's staff privileges.

In June 1994 the FMH Executive Committee recommended to its Governing Board that Odom's staff privileges be suspended until the earliest of one of the following occurred:

1. The request to the Governing Body that [Odom's] privileges be terminated is finally resolved; or

2. The Executive Committee approves a written proposal from [Odom] that [his] privileges be exercised only when [he is] accompanied by and supervised by an anesthesiologist with appropriate qualifications; or

3. [Odom] attend[s] further residency training or other proctored form of additional training which results in recommendations which satisfy the Executive Committee that [he has] identified and corrected the problems which have resulted in the substandard level of care reflected by the attached documents.

On August 22, 1994, Odom entered a formal evaluation/retraining program at Loma Linda University Medical Center. On September 10, while he was still in the retraining program, the Governing Board accepted the Executive Committee's recommendation to terminate Odom's medical staff membership and clinical privileges. Odom was informed of his termination on September 27. In compliance with 42 U.S.C. § 11133, FMH reported to a national reporting system that Odom's staff privileges had been terminated. The reasons given for Odom's termination were "Incompetence/Malpractice/Negligence." Persons who are the subjects of such a report are allowed to comment on the

report; *Odom did so.* In his response, Odom alleged that the quality assurance investigation was a result of his announced intention to compete with FMH and that the information provided in the report was knowingly false.

Upon Odom's completion of the program at Loma Linda, he reapplied for staff privileges at FMH and was denied.

Odom, pro se, brought suit against FMH, Lutheran Health System; Western Health Network; Former FMH Administrator James H. Gingerich; FMH Assistant Administrator Susan McLane; FMH Quality Assurance Manager Linda Smith; FMH attorney Ronald Bliss; medical doctors Hoi P. Lee, Steve E. Mancill, Jerry A. Perisho, Lawrence W. Stinson and William F. Stoddard; Anesthesia Associates, Inc.;[1] and former Chief of the FMH Surgery Department, Danny R. Robinette (collectively FMH). Odom alleged eleven claims for relief: (1) unreasonable restraint of trade; (2) group boycott; (3) attempted monopolization; (4) defamation; (5) breach of contract; (6) unfair trade practices; (7) tortious interference with prospective economic advantages; (8) intentional infliction of emotional distress; (9) denial of due process and equal protection; (10) claim for declaratory relief; and (11) permanent injunction.

The superior court granted FMH's motion to dismiss for failure to state a claim, pursuant to Alaska Rule of Civil Procedure 12(b)(6), dismissing all of Odom's claims. It awarded FMH attorney's fees and costs in the amount of $7,220.30. It awarded the doctors and Anesthesia Associates, Inc. attorney's fees and costs in the amount of $5,520.00. Odom appeals the ruling as to eight of the eleven claims. Odom also appeals the superior court's order granting attorney's fees.

---

1. Anesthesia Associates, Inc. is an Alaska corporation owned and operated by anesthesiologists Lee and McGregor. The corporation employs the certified registered nurse anesthetists (CRNAs) who work at FMH.

2. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is unlawful." AS 45.50.562.

## III. DISCUSSION

### A. Standard of Review

 An order dismissing a complaint for failure to state a claim is reviewed de novo. *See Kollodge v. State,* 757 P.2d 1024, 1026 n. 4 (Alaska 1988). For a complaint to survive a Rule 12(b)(6) motion, the complaint need only allege a set of facts "consistent with and appropriate to some enforceable cause of action." *Linck v. Barokas & Martin,* 667 P.2d 171, 173 (Alaska 1983). A complaint should be deemed sufficient, and a motion to dismiss denied, if "evidence may be introduced that will sustain a grant of relief to the plaintiff." *Id.* Because complaints should be liberally construed, "[m]otions to dismiss are viewed with disfavor and should rarely be granted." *Kollodge,* 757 P.2d at 1026.

### B. The Superior Court Improperly Dismissed All of Odom's Claims Alleging That FMH Violated Alaska's Antitrust Statute, AS 45.50562–.596.

Odom alleges that FMH violated two separate provisions of Alaska's antitrust act, AS 45.50.562 and AS 45.50.564. He raises three claims: (1) unreasonable restraint of trade,[2] (2) group boycott,[3] and (3) unlawful monopoly.[4] We look to federal precedent when analyzing an antitrust claim. *See West v. Whitney–Fidalgo Seafoods, Inc.,* 628 P.2d 10, 14 (Alaska 1981) ("The legislature intended that Alaska courts would look to Sherman Act cases in construing the [antitrust] Act."). Claims brought under AS 45.50.562 are also referred to as Sherman Act § 1 claims; claims under AS 45.50.564 have been termed Sherman Act § 2 claims.

### 1. Odom alleged injury to competition overall, as is necessary for Odom to have standing to sue FMH for antitrust violations.

 For a private litigant seeking treble damages to have standing, "[a] plaintiff must

---

3. This is considered a per se violation of AS 45.50.562.

4. "It is unlawful for a person to monopolize, or attempt to monopolize, or combine or conspire with another person to monopolize any part of trade or commerce." AS 45.50.564.

show not only the fact of injury from the alleged violation, but that the injury alleged is 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *KOS v. Alyeska Pipeline Serv. Co.*, 676 P.2d 1069, 1073–74 (Alaska 1983) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 479, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). Furthermore, the "plaintiff must demonstrate that the defendant's conduct was intended to or did have some anticompetitive effect beyond his own loss of business or the market's loss of a competitor." *KOS*, 676 P.2d at 1074 (quoting *California Computer Prods., Inc. v. International Bus. Machs. Corp.*, 613 F.2d 727, 732 (9th Cir.1979)).

■ Paragraphs 7 and 135 of Odom's complaint allege facts sufficient to establish standing to sue under Alaska's antitrust statute.[5]

In a similar case, the United States Court of Appeals for the Ninth Circuit found that a doctor proved injury to competition and had standing to sue for having his medical staff privileges terminated. *See Pinhas v. Summit Health, Ltd.*, 880 F.2d 1108 (9th Cir. 1989). The doctor alleged that the "conspiracy was intended to boycott his attempts at providing patients with lower prices as a result of his ability to perform operations at a rate quicker than that of his competitors." *Id.* at 1116. The court held that Pinhas could prove injury to competition by showing "that his preclusion ... substantially reduced total competition in the market." *Id.* Odom has alleged facts that, assuming them true, show that total competition of the Fairbanks market was reduced because of FMH's actions. If the trier of fact finds, as Odom's complaint alleges, that termination of Odom's staff privileges financially incapacitated him so that he could not continue with his plans to open FSC, the competitive market for anesthesiology services in Fairbanks was harmed by FMH's action.

2. *Odom alleged a prima facie case of unreasonable restraint of trade.*

■ To establish a prima facie case of unreasonable restraint of trade under AS 45.50.562, Odom must set forth facts which if proven would establish that "the defendants combined or conspired with an intent to unreasonably restrain trade." *Smith v. Northern Mich. Hosps., Inc.*, 703 F.2d 942, 949 (6th Cir.1983). Whether actions are tantamount to unreasonably restraining trade is determined by either the rule of reason test or the per se analysis. The rule of reason test should be applied to Odom's termination of staff privileges to determine whether FMH's conduct was unreasonable. *See Miller v. Indiana Hosp.*, 843 F.2d 139, 144 n. 6 (3d Cir.1988) ("[I]n a hospital staff privilege case in which the hospital defends on lack of professional ability, the rule of reason test would apply."). To establish unreasonable restraint of trade under the rule of reason test, Odom must prove three elements: "(1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually injures competition." *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1445 (9th Cir.1988).

■ Applying the rule of reason test, paragraphs 2, 7, and 135 of Odom's complaint allege a prima facie case of unreasonable restraint of trade.

3. *Odom alleged facts sufficient to state a claim that FMH engaged in a per se group boycott.*

■ Group boycotts constitute per se violations of the Sherman Act § 1, and Alaska's statutory equivalent, AS 45.50.562. *Id.* at 1445 n. 1 ("Group boycotts or concerted refusals to deal constitute per se categories....."). The three characteristics which are "indicative of per se illegal boycotts [are]: (1) the boycott cuts off access to a supply, facility, or market necessary to enable the victim firm to compete; (2) the boycotting firm possesses a dominant market position;

---

**5.** Appendix A sets out the full text of the paragraphs of Odom's complaint needed to decide his appeal.

and (3) the practices are not justified by plausible arguments that they enhanced overall efficiency or competition." *Hahn v. Oregon Physicians' Serv.,* 860 F.2d 1501, 1509 (9th Cir.1988). *See also Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 294–95, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985).

▮▮ Paragraphs 3, 5, 50, and 52 of Odom's complaint allege facts sufficient to state a claim that FMH engaged in a group boycott.

4. *Odom alleged enough facts to state a claim for attempted monopolization.*

Odom's final antitrust claim alleges that FMH violated AS 45.50.564.[6]

▮▮ " '[A] prima facie case of attempt to monopolize is made out by evidence of a specific intent to monopolize "any part" of commerce, plus anti-competitive conduct directed to the accomplishment of that unlawful purpose.' " *West v. Whitney–Fidalgo Seafoods, Inc.,* 628 P.2d 10, 15 (Alaska 1981) (alteration in original) (quoting *Greyhound Computer v. International Bus. Machs.,* 559 F.2d 488, 504 (9th Cir.1977)). The court noted that "[t]he more market power that exists, the more likely it is that a given course of questionable conduct will suggest the existence of intent to monopolize." *Id.*

▮▮ Paragraphs 3, 7, 15, and 25 of Odom's complaint sufficiently allege an attempt to monopolize claim.

C. *Odom Stated a Claim for Defamation.*

▮▮ A prima facie case of defamation requires the plaintiff to establish "(1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) the existence of either 'per se' actionability or special harm." *French v. Jadon, Inc.,* 911 P.2d 20, 32 (Alaska 1996). For a statement to be libel per se, "the words used must be so unambiguous as to be reasonably susceptible of only one interpretation—that is, one which has a natural tendency to injure another's reputation." *Fairbanks Publ'g Co. v. Pitka,* 376 P.2d 190, 194 (Alaska 1962).

▮▮ Included in Odom's allegations of defamatory conduct is a claim that FMH defamed Odom in its reporting of the disciplinary action to the federally mandated National Practitioner Data Bank (Data Bank), a report FMH is required to make. Although a health care entity that is complying with the federal reporting requirement, pursuant to 42 U.S.C. § 11133(a)(1), is afforded a certain amount of immunity in reporting to the Data Bank, that immunity is limited. 42 U.S.C. § 11137(c) provides that "No person or entity . . . shall be held liable in any civil action with respect to any report made under this subchapter . . . without knowledge of the falsity of the information contained in the report." FMH, therefore, is immune from liability *unless* it had knowledge that the report was false.

▮▮ In our view "falsity" in this statute refers to a false report of the nature of or the stated reasons for the actions of a health care entity. Thus in *Brown v. Presbyterian Healthcare Services,* 101 F.3d 1324, 1334 (10th Cir.1996), a report was made to the Data Bank that Brown's obstetrical privileges had been suspended for the coded reasons "Incompetence/Malpractice/Negligence." But the reason stated by the health care provider in the suspension order was that Brown had failed to abide by an agreement to consult in handling certain types of cases. Since the stated reason relied on by the health care provider did not necessarily match the stated reason reported to the Data Bank, the court concluded that a jury question was presented as to whether the report to the Data Bank was false and whether the defendant who had made the report knew it to be so. That is not the situation here where the complaint and exhibits attached to the complaint demonstrate the facial truth of the report to the Data Bank—that Odom was suspended for stated reasons expressed by FMH that fairly fell within the coded reasons. The statutory privilege would be meaningless if it meant that one who accu-

---

**6.** "It is unlawful for a person to monopolize, or attempt to monopolize, or combine or conspire with another person to monopolize any part of trade or commerce." AS 45.50.564.

rately reported the stated reasons for a health care provider's action would nonetheless have to defend the underlying validity of the stated reasons. Thus, to the extent that Odom's claim is based on the assertion that the stated reasons relied on by the health care provider were not those reported to the Data Bank, Odom's claim was properly dismissed.

■ However, Odom's defamation claim asserts many communications other than the falsity of the stated reasons reported to the Data Bank. To the extent that it does so it alleges a prima facie case of defamation. Paragraphs 3, 5, 9, 50, and 146–150 of Odom's complaint allege a prima facie case of defamation.

D. *The Order of Suspension Does Not Preclude Odom from Suing FMH for Breach of an Oral Contract.*

■ Odom claims FMH breached an oral contract. The contract, he alleges, resulted from statements made by defendant Ronald Bliss, on which Odom relied when he withdrew his request for an administrative hearing. Odom's complaint alleges:

> On August 30, 1994 Defendant Bliss entered into a verbal agreement with [Odom's] attorney Burbank authorizing [Odom's] course of study at LLUMC as a remedy which if satisfactorily completed, would fulfill the June 2, 1994 Order of Suspension and allow [Odom] to return to his practice at FMH. Bliss and Burbank further agreed that in light of [Odom's]

participation in the training program at Loma Linda that the FMH medical staff administrative hearing scheduled for November, 1994 would not be required.

The alleged oral contract was made subsequent to Odom receiving the Order of Suspension,[7] which listed three options the Executive Committee could take in relation to Odom's suspension.[8]

■ The Order of Suspension, dated June 2, 1994 is clear; Odom's suspension was to continue until "the earliest of one [of three] events." The existence of the Order of Suspension does not, however, preclude Odom from making a claim that there was a separate oral contract made and breached by FMH. Whether an oral contract exists is an issue for the trier of fact and was improperly dismissed by the superior court. *See George v. Custer*, 862 P.2d 176, 178 n. 3 (Alaska 1993) ("It is for the trier of fact to determine whether an oral contract exists and the contract's terms where the evidence conflicts."); *B.B. & S. Constr. Co., Inc. v. Stone*, 535 P.2d 271, 273 (Alaska 1975) ("Where the existence of an oral contract and the terms thereof are the points in issue and the evidence is conflicting, it is for the trier of the facts to determine whether the contract did in fact exist and, if so, the terms thereof.").

E. *Odom Stated a Claim for Violation of Alaska's Unfair Trade Practices Act.*

■ Odom sought relief for violation of AS 45.50.471(a),[9] (b)(7), (11) and (12).[10] Odom, as a private litigant, sued for violation

---

7. Odom's Order of Suspension is dated June 2, 1994.

8. The three options the Executive Committee could take which were listed in the Order of Suspension are set out *supra* p. 127.

9. "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful." AS 45.50.471(a).

10. (b) The terms "unfair methods of competition" and "unfair or deceptive acts or practices" include, but are not limited to, the following acts:
. . . .
(7) disparaging the goods, services, or business of another by false or misleading representation of fact;

. . . .
(11) engaging in any other conduct creating a likelihood of confusion or of misunderstanding and which misleads, deceives or damages a buyer or a competitor in connection with the sale or advertisement of goods or services;
(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged.
AS 45.50.471(b).

of the Unfair Trade Practices Act pursuant to former AS 45.50.531.[11] "Two elements must be proved to establish a prima facie case of unfair or deceptive acts or practices under the Alaska Act: (1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred." *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 534 (Alaska 1980). "An act or practice is deceptive or unfair if it has the capacity or tendency to deceive. Actual injury as a result of the deception is not required.... All that is required is a showing that the acts and practices were capable of being interpreted in a misleading way." *Id.* at 534–35 (footnotes omitted).

 Paragraphs 3, 8, 15, 50, 73, 119, and 125 of Odom's complaint allege facts sufficient to state a claim under Alaska's Unfair Trade Practices Act.

### F. *Odom Alleged Sufficient Facts to State a Claim that FMH Interfered with His Prospective Economic Advantage with the FSC.*

 The tort of intentional interference with prospective economic advantage is analyzed under the same rubric as the tort of intentional interference with contractual relations. *See Oaksmith v. Brusich*, 774 P.2d 191, 198 (Alaska 1989). The elements a plaintiff must prove when alleging intentional interference with a prospective economic advantage are:

> [I]s [there] sufficient evidence that: 1) a prospective business relationship existed ... 2) [the defendant] knew of the prospective relationship and intended to prevent its fruition, 3) the prospective business relationship did not culminate in pecuniary benefit to [the plaintiff], 4) [the defendant's] conduct interfered with the prospective relationship, 5) the inter-

ference caused [the plaintiff's] damages, and 6) [the defendant's] conduct was not privileged or justified.

*Id.* Under the theory of intentional interference with prospective economic advantage, "a person who is involved in an economic relationship with another, or who is pursuing reasonable and legitimate prospects of entering such a relationship, is protected from a third person's wrongful conduct which is intended to disrupt the relationship." *Ellis v. City of Valdez*, 686 P.2d 700, 707 (Alaska 1984).

 Odom alleges facts which if proven state a claim that FMH intentionally interfered with his prospective business relationship with FSC. Odom alleges: (1) a prospective business relationship existed between him and the Fairbanks Surgery Center, Inc., a distinct and separate entity;[12] (2) FMH knew of this relationship; (3) Odom has not been able to open the FSC because he was financially devastated when his staff privileges were terminated; (4) FMH intentionally interfered with his relationship with FSC by terminating his staff privileges; (5) terminating his staff privileges damaged him financially so as to be unable to open FSC; and (6) FMH's conduct was not privileged or justified.

### G. *The Superior Court Abused Its Discretion in Making the Threshold Determination that FMH's Conduct Was Not Outrageous and Odom Did Not Suffer Severe Distress.*

The last claim Odom appeals is the dismissal of his claim for damages arising from intentional infliction of emotional distress. Odom alleges that the "[d]efendants' conduct intentionally inflicted extreme emotional distress upon [him]."

Former AS 45.50.531(a).

---

**11.** (a) A person who suffers an ascertainable loss of money or property as a result of another person's act or practice declared unlawful by AS 45.50.471 may bring a civil action to recover actual damages or $200, whichever is greater. The court may, in cases of wilful violation, award up to three times the actual damages sustained. The court may provide other relief it considers necessary and proper.

**12.** The Articles of Incorporation for the Fairbanks Surgery Center were recorded on March 9, 1994. On September 18, 1995, the State of Alaska granted the Fairbanks Surgery Center a "Certificate of Need."

■ To establish a prima facie case of intentional infliction of emotional distress, the plaintiff must prove that the defendant "through extreme or outrageous conduct ... intentionally or recklessly cause[d] severe emotional distress or bodily harm to another." *Richardson v. Fairbanks N. Star Borough,* 705 P.2d 454, 456 (Alaska 1985). This court has stated that a trial judge "should make a threshold determination whether the severity of the emotional distress and the conduct of the offending party warrant a claim of intentional infliction of emotional distress." *Id.* A trial judge's threshold determination, should not be overruled by this court "absent an abuse of discretion." *Id.*

■ This court has held that liability for intentional infliction of emotional distress should only be found when " 'the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Hawks v. State, Dep't of Pub. Safety,* 908 P.2d 1013, 1016 (Alaska 1995) (quoting *Oaksmith v. Brusich,* 774 P.2d 191, 200 (Alaska 1989)). The conduct in which FMH allegedly engaged reaches the level of outrageousness necessary for Odom to state a claim for intentional infliction of emotional distress. Paragraphs 3, 7, 8, 35, 119, and 125 of Odom's complaint allege facts sufficient to state a claim of intentional infliction of emotional distress.

## IV. CONCLUSION

Odom's complaint alleges facts which if proven are sufficient to state a claim for unreasonable restraint of trade, group boycott, attempted monopolization, defamation, breach of oral contract, unfair trade practices, interference with a prospective economic advantage, and intentional infliction of emotional distress. Accordingly, we REVERSE the superior court's dismissal of these claims and its awards of attorney's fees to FMH and to the doctors and Anesthesia Associates, Inc.

EASTAUGH, Justice, not participating.

FABE, Justice, concurring in part and dissenting in part.

I disagree with the court's view that Odom has alleged a prima facie case of defamation. Although the court is correct in its determination that Fairbanks Memorial Hospital should not be liable for its report to the National Practitioner Data Bank, the court also concludes that "Odom's defamation claim asserts many communications other than the falsity of the stated reasons report[ed] to the Data Bank" and thus "alleges a prima facie case of defamation." It is with this conclusion that I disagree.

Odom's complaint contains a broad charge that FMH engaged in a pattern of communicating "false and fraudulent information against the Plaintiff" and avers that these communications "occurred on numerous occasions by United States mail, telephone, in person, and through other forms of fraudulent communications." But the only specific instances of defamation described in the complaint are FMH's report to the National Practitioner Data Bank, which this court has disallowed as a basis for a claim of defamation, and Odom's own report of his predicament to insurance companies and lending institutions. The question presented to the superior court in the motion to dismiss was whether these latter instances of "self-publication" could form the basis of a defamation claim. The superior court decided that they could not, dismissing the defamation claim on the basis that "the statements were not false or defamatory because Odom had lost his hospital privileges. Also, the statements were not concerning another, as Odom relayed the information about his predicament."

In his briefing before us on appeal, Odom does not contest the superior court's conclusion that "Odom has self-published, which is not grounds for a defamation action." Instead, he argues that FMH's transmission of information about his terminated privileges to the National Practitioner Data Bank forms the basis of his defamation claim:

> [D]efendants have uttered and published *false and defamatory statements* about plaintiff in writing and, upon information and belief, orally, with respect to plaintiff's

conduct, employment, career, and fitness to practice medicine. . . .

In support of this allegation, Odom alleged the following:

Gingerich sent notification of Odom's termination to the U.S. National Practitioner Data Bank as mandated by 42 U.S.C. § 11111. Gingerich further characterized the reason for Odom's dismissal in this notification as "incompetence/malpractice/negligence." This defamed Odom *nationally to all future possible hospital practice positions.*

(Emphasis in original.)

Odom has pointed to no other instance of defamation in his complaint[1] or his briefing to this court. The only issue that he has raised and discussed is the report to the National Practitioner Data Bank. Because we resolve this issue against Odom, I disagree with the draft's conclusion that other claims of defamation survive.

### APPENDIX A

Odom's complaint reads in part:

2. This action arises out of Defendants' combination and conspiracy to unlawfully restrain trade and harm competition in operating room services and anesthesiology services, combination and conspiracy to dominate the relevant market for operating room services and anesthesiological [sic] services, and group boycott, all having substantial and injurious effects upon interstate commerce. This action also arises out of Defendants' open-ended and continuous pattern and scheme to defraud, discharge, defame and compete unfairly with Plaintiff in connection with Plaintiff's professional career in general, Plaintiff's professional affiliation with defendants in particular, Plaintiff's plans to develop an outpatient surgery center, which pattern and scheme involves multiple victims, including the general public, has already extended from at least October 5, 1992 to date, and threatens to continue.

3. As more fully set forth below, upon information and belief, defendant anesthesiologists Jerry A. Perisho, M.D., Hoi P. Lee, M.D., Randall K. McGregor, M.D., Steve E. Mancill, M.D., Lawrence W. Stinson, Jr., M.D., and William F. Stoddard, M.D., as well as Defendant Anesthesia Associates, Inc., with the knowledge, participation, and acquiescence of Defendants Fairbanks Memorial Hospital ("FMH" or the "Hospital"), Lutheran Health Systems ("LHS"), Western Health Network ("WHN"), FMH Administrator James H. Gingerich, Assistant Administrator Susan McLane, FMH Quality Assurance Manager Linda Smith, attorney Ronald L. Bliss, Danny R. Robinette, M.D.[,] as well as with other unnamed co-conspirators, who include physicians within the Hospital, and with malice and intent to injure Plaintiff; (a) engaged in a pattern of conduct pursuant to which they improperly removed Plaintiff from the FMH medical staff in bad faith and reported this act to the United States National Practitioner Databank, thus preventing Plaintiff from pursuing his livelihood and practicing his specialty in any hospital[;] (b) fabricated false claims and exaggerated other claims against plaintiff on quality of care issues, used discriminatory criteria in quality of care determinations, and acted in secrecy to further their personal interests rather than those of the patients of the Hospital; (c) subverted the mandated Quality Assurance and Peer Review mechanisms, corrupted the Hospital medical and administrative processes and controls, violated the Hospital Medical Staff Bylaws; (d) concealed the real

---

1. The paragraphs of the complaint cited by the court do not support its conclusion that Odom has alleged other defamatory statements. Paragraphs 146–150 contain the "self-publication" claims, and paragraphs 5 and 9 allege malicious reporting to the National Practitioner Data Bank.

Paragraphs 3 and 50 do not relate to defamation at all, instead alleging that the hospital wrongfully revoked his hospital privileges, "fabricat[ing] false claims and exaggerat[ing] other claims against [Odom] on quality of care issues."

anti-competitive motives for discharging and replacing Plaintiff, communicated false and fraudulent information on repeated occasions within and outside FMH, within and outside the state, to, *inter alia*, medical staff, hospital administrators and state agencies regarding Plaintiff's performance; (e) caused Plaintiff to be discharged from the FMH medical staff by improperly influencing FMH Medical Staff procedures in bad faith[;] (f) fabricated additional allegations against plaintiff after his termination from the FMH medical staff in an attempt to further alter the record and give credibility to their actions.

4. The communication of false and fraudulent information against the Plaintiff occurred on numerous occasions by United States mail, telephone, in person, and through other forms of fraudulent communications and activities.

5. Acting under [the] color of Federal and State law, the Defendants also reported, maliciously and in bad faith, these false and fraudulent allegations as the purported basis for their action to other hospitals and State agencies, the U.S. National Practitioner Databank, and triggered a government investigation against Plaintiff. This action was part of a successful effort to utilize a sham to exclude plaintiff from the medical staff of the Hospital, and from anesthesiological [sic] practice throughout the State of Alaska and throughout the United States of America for anti-competitive purposes.

. . . .

7. Defendant FMH and Anesthesia Associates, Inc., Lee, McGregor, Perisho, Mancill, Stinson, and Stoddard achieved their anti-competitive objective of maintaining monopoly status in a geographically isolated market area for both the Fairbanks Memorial Hospital and the contracted FMH anesthesiologists by successfully discouraging the development of a competing surgery center by financially incapacitat-

ing and ruining the reputation of its developer and promoter.

8. Such conduct has harmed and continues to harm and will continue to harm in the future both consumers of anesthesiology care and operating room services in the Fairbanks North Star Borough area.

9. Absent the successful development of a surgery center, Defendants have precluded Plaintiff from the operating room practice of anesthesiology at FMH or elsewhere by a fabricated and pretextual basis. Defendants have maliciously, willfully and intentionally defamed plaintiff by fabricating instances of plaintiff's misconduct, exaggerating other claims against Plaintiff, and reporting such false and defamatory statements verbally and in writing to the U.S. National Practitioner Databank and to state regulatory authorities, all in furtherance of their scheme.

. . . .

15. Fairbanks Memorial Hospital ("FMH") is a non-profit hospital, located in Fairbanks, Alaska, is authorized to do business in Alaska, and is the only full service hospital in Alaska north of the Alaska (mountain) Range.

. . . .

25. FMH is presently the sole civilian provider of operating room services in the Fairbanks market area.

. . . .

35. As soon as FMH, LHS and WHN understood that Plaintiff Odom was or could become a competitive threat to FMH and its monopoly of operating room services, Defendant Gingerich conspired with Defendants Anesthesia Associates, Inc., Lee, McGregor, Perisho, and Mancill, and later with Defendants Stinson and Stoddard, all of whom share in a parallel monopoly for the provision of related services, to embark on a course of action to discredit Odom and ultimately to remove from him his livelihood, through impugning his medical competence. Hence, FMH,

WHN, LHS and the Defendants Anesthesia Associates, Inc., Lee, McGregor, Perisho, Mancill, Stinson, and Stoddard in complicity with Defendants Bliss, McLane, Smith, and Robinette sought to remove Odom's financial capacity in order to prevent him from pursuing development of the competing enterprise and to prevent him from seeking judicial redress.

. . . .

50. When the Defendants Anesthesia Associates, Inc., Lee, McGregor, Perisho, and Mancill learned of Odom's decision, they contacted the Chief of Staff of FMH, Keith Gianni, M.D., and requested that Odom's hospital privileges to practice medicine at FMH be immediately suspended, without notice or hearing. Defendants Anesthesia Associates, Inc., Lee, McGregor, Perisho, and Mancill represented to Dr. Gianni that Odom's conduct was disruptive and impaired patient care. Defendants Anesthesia Associates, Inc., Lee, McGregor, Perisho, and Mancill also represented to Dr. Gianni that there were quality assurance issues which also warranted an immediate suspension of privileges. Based on these representations, all of which were false, the Chief of Staff did, in fact, enter an emergency order suspending Odom's privileges to practice at FMH, effective immediately. . . .

. . . .

52. Within twenty-four hours after requesting FMH's Chief of Staff to immediately suspend Odom's hospital privileges, Defendants Anesthesia Associates, Inc., Lee, McGregor, Perisho, Mancill, and Stinson met, in secret with FMH administrator Gingerich, FMH Outpatient Services administrator Susan McLane, and FMH Quality Manager Linda Smith, excluding Odom's participation, and agreed among themselves to:

(a) preclude Odom from practicing anesthesiology at FMH under the terms and provisions of the 1993 Anesthesia Agreement and future agreements;

(b) preclude Odom from receiving a pro-rated share of the anesthesia practice at FMH;

(c) disparage Odom's professional reputation by innuendo, accusations and false statements relative to Odom's professional competence, thusly preventing Odom from pursuing his outpatient surgery center project. . . .

(d) missuse the peer review process to advance personal and corporate anti-competitive ends.

. . . .

73. A set of accusations were prepared under the guidance of attorney Bliss. These accusations deliberately exaggerated the severity of the purported incidents and mischaracterized and defamed Plaintiff. Further, the Defendants exaggerated the severity of the incidents to justify their request to the Medical Staff Executive Committee for Formal Corrective Action. Besides the five cases reviewed by the FMH Anesthesia Section quality assurance committee, the case informally resolved by Surgery Department QA committee in January, 1993 is added in to make a total of six cases referenced in the final report.

. . . .

113. Gingerich sent notification of Odom's termination to the U.S. National Practitioner Data Bank as mandated by 42 USC 11111. (NPDB process date 9/16/94) Gingerich further characterized the reason for Odom's dismissal in this notification as "incompetence/malpractice/negligence."
This defamed Odom nationally to all future possible hospital practice positions. . . .

. . . .

119. In addition, Bliss made a mischaracterization of Odom's practice history. Bliss made a blanket, false and un-

substantiated statement that nine locations of previous practice gave damning professional references. All laudatory reports were intentionally omitted. Bliss also made unsubstantiated intimations that where information was lacking, it was therefore also damning. This false and misleading practice history was presented to the FMH Credentials Committee as well as the Ad Hoc Committee. Bliss' statements were also a significant factor in the May 10, 1995 rejection.

. . . .

125. The statements contained in these various communications were false and defamatory, and were uttered and published with malice, intent to injure plaintiff and his reputation and career, and with intent to restrain trade and monopolize the relevant market by injuring and impairing competition.

126. Upon information and belief, in addition to the writings referred to herein, defendants orally defamed plaintiff by uttering false and defamatory statements of the type alleged to prospective business partners, investors and others.

. . . .

135. The termination of plaintiff's staff privileges and membership at Fairbanks Memorial Hospital resulted in his exclusion from the practice of anesthesiology. Plaintiff's capability to continue his surgery center project has been severely hampered by his loss of financial capacity and reputation. If successful in preventing Plaintiff from completing his project, Defendants will have deprived many individual patients and referring physicians of access to alternative operating room services for a substantial period of time.

. . . .

146. Paragraphs 1 through 46 and 65 through 145 are repeated and realleged as if set forth in full herein.

147. Defendants, as originators of the wrongful termination and withdrawal of privileges, and other defamatory conduct and statements set forth herein, knew that plaintiff would be compelled to disclose the contents of such conduct and statements to third parties in connection with applications for hospital medical staff privileges, malpractice insurance, membership in professional organizations, business loan applications, stock offerings, and related purposes.

148. Plaintiff in fact has been compelled to disclose the defamatory conduct and statements made about him to third parties in connection with discussions for employment, malpractice insurance, licensing, business loans, and related purposes, and will be compelled to make further disclosures of this type in the future.

149. The defamatory statements set forth herein were motivated by Defendants' malice, ill will, personal spite, or in the alternative by defendants' culpable recklessness or gross negligence.

150. By reason of the foregoing, Defendants have uttered and published false and defamatory statements about Plaintiff in writing and, upon information and belief, orally, with respect to Plaintiff's conduct, employment, career, and fitness to practice medicine, and have compelled Plaintiff to repeat Defendants' defamation to others in connection with his professional career, all damaging plaintiff.