David M. ODOM, M.D., Appellant,

v.

Hoi P. LEE, M.D., Steve E. Mancill, M.D.,
Jerry A. Perisho, M.D., Randall K.
McGregor, M.D., Lawrence W. Stinson,
Jr., M.D., Appellees.

No. S–7547.

Supreme Court of Alaska.

March 17, 2000.

David M. Odom, M.D., pro se, Fairbanks.

Ronald L. Bliss, Bliss & Wilkens, Anchorage, for Appellees.

Before COMPTON, Chief Justice, MATTHEWS, FABE, and BRYNER, Justices.

## OPINION

COMPTON, Chief Justice.

### I. INTRODUCTION

Dr. David M. Odom and four other doctors (Defendant doctors) were parties to a contract for sharing an anesthesiology practice at Fairbanks Memorial Hospital. Following a dispute with the Defendant doctors, Dr. Odom filed suit alleging damages for breach of contract, tortious interference with a contract right, conspiracy to restrain trade, and unfair trade practices. Dr. Odom appeals pro se from the denial of his motions for continuance and to amend pleadings, and from the grant of summary judgment in favor of the Defendant doctors on all issues. We reverse the summary judgment and remand for a jury trial.[1]

### II. FACTS AND PROCEEDINGS

The parties to this litigation are all licensed physicians specializing in anesthesiology. They hold staff privileges at Fairbanks Memorial Hospital (FMH). They[2] began sharing the anesthesia practice at FMH in 1989.[3]

---

1. In view of our reversal of the summary judgment, we need not address the denial of the motions for continuance and to amend pleadings.

2. A sixth doctor, Lawrence W. Stinson, joined the group later.

3. In 1991 and 1992, the sharing was not pursuant to the formal agreement with FMH later herein described.

The doctors had a contract among themselves, titled "Anesthesia Coverage Rules and Regulations" (Rotation Agreement). This contract stated each doctor's responsibility to the others in fulfilling their agreement with FMH. The agreement between the doctors collectively and FMH was titled "Fairbanks Memorial Hospital Anesthesiologist Agreement." In it the doctors are denominated the Anesthesia Staff. This agreement incorporated the terms of the Rotation Agreement. Under this agreement, "[a]dditional anesthesia services added or staffing requirement changes due to increased rooms, services, etc. shall be by Joint Collaboration with the anesthesia staff." Additionally, FMH agreed that it would "not solicit or recruit for the provision of anesthesia services during the period of this Agreement without first notifying the Anesthesia Staff." The five doctors would provide twenty-four-hour-a-day anesthesia coverage to FMH. Each doctor also had a separate contract with FMH that allowed the doctor to practice medicine at FMH.

Two of the doctors, Hoi P. Lee and Randall K. McGregor, had practiced anesthesiology in Fairbanks before the formation of the Rotation Agreement with the other doctors. They owned Anesthesia Associates, Inc. This corporation employed a staff of Certified Registered Nurse Anesthetists (CRNAs), who assisted the doctors in the operating room.

The Rotation Agreement set up a detailed rotation schedule among the doctors and among the CRNAs, and provided for modification of the schedule. It also provided that if the doctors could not agree on a modification, the doctor wanting unscheduled time off was responsible for providing coverage during his absence. The doctors followed this procedure for approximately five years.

The rotation schedule required the doctor in the "number one" position to supervise two operating rooms, each staffed by a CRNA. The second, third, and fourth doctors in the rotation each worked in one operating room with no CRNA, and the fifth doctor was off-duty.

This controversy had its genesis in CRNA Kay Wilson's refusal to follow Dr. Odom's instructions during a certain type of procedure.[4] After the third incident with CRNA Wilson, Dr. Odom approached Dr. Lee about the problem. He got no definitive response from Dr. Lee.

The specific precipitating event occurred on October 4, 1993, when Dr. Odom was choosing rooms for the following day. He realized he would be in the number one position on the rotation. He intended to use the procedure CRNA Wilson had refused to help with in the past; CRNA Wilson was assigned to work with Dr. Odom that day. Dr. Odom advised the surgical secretary that he would take only one operating room the following day, and that the second room and the CRNAs should be assigned to the number two doctor.

Following this incident, the Defendant doctors sent a memo to the FMH Chief of Staff about the incident involving Dr. Odom. The same day, the FMH Chief of Staff suspended Dr. Odom's staff privileges for twenty-four hours. The Defendant doctors also met and decided to revoke their contract with Dr. Odom. They notified Dr. Odom that they would exclude him from their new contract. After FMH reinstated his staff privileges the following day, Dr. Odom could perform services at FMH only at the request of a patient or a particular physician. He no longer received a share of the general anesthesiology practice at FMH.

Dr. Odom filed suit alleging damages for breach of contract, tortious interference with a contract right, conspiracy to restrain trade, and unfair trade practices. The Defendant doctors accepted Dr. Odom back into the rotation approximately two months after the incident with CRNA Wilson, after he filed suit.

After Dr. Odom's reinstatement in the rotation schedule, FMH began administrative proceedings to revoke his hospital privileges.

4. The procedure CRNA Wilson refused to cooperate in is called Propofol Infusion. This type of anesthesia is administered through the blood stream rather than through the respiratory system. There is no dispute about Dr. Odom's use of this procedure.

Dr. Odom's original attorney, Joseph Sheehan, had limited his representation of Dr. Odom to the suit against the Defendant doctors. Mr. Sheehan specifically did not want to sue FMH or expand the suit to issues beyond the breach of the Rotation Agreement. Because of this, Dr. Odom retained a different lawyer to represent him in the administrative proceeding before FMH during the first part of 1994. In June 1994, following the administrative proceeding, FMH revoked Dr. Odom's hospital privileges.

Trial was set for April 1995. In October 1994 Dr. Odom sought a continuance of the trial date because he needed additional discovery for his case against the Defendant doctors. This was at a time when Dr. Odom already knew of his potential claims against FMH and its parent corporation, based on revocation of his privileges in June of that year. The superior court granted his unopposed motion for continuance; a new trial date was set for January 1996. The deadline for amending pleadings was September 1995.

In July 1995 Mr. Sheehan formally informed Dr. Odom that he was withdrawing as Odom's counsel. Dr. Odom attempted to find other counsel, but initially was unsuccessful. In August the Defendant doctors filed a motion for summary judgment. On September 19 the superior court granted Mr. Sheehan's motion to withdraw. Dr. Odom sought and received a two-week extension of the deadline for his response to the summary judgment motion. On October 2 he filed a pro se cross-motion for summary judgment.

On October 20, Ray Brown, a partner in the law firm of Dillon & Findley, appeared for Dr. Odom. He filed a motion to vacate the trial date and for a continuance. At oral argument, Mr. Brown told the superior court that, if it granted the motion, his firm would represent Dr. Odom and be ready for trial in nine months. The superior court denied the motion. On October 7, Mr. Brown filed a motion to supplement his summary judgment briefing, and for a Rule 56(f) continuance. The trial court denied this motion on November 15. After the November 15 ruling Brown declined to represent Dr. Odom further.

Following oral argument, in which Dr. Odom appeared pro se, the superior court granted summary judgment to the Defendant doctors on three of the four claims. The court took the claim of tortious interference with contract under advisement, and considered two additional arguments that Dr. Odom had failed to raise. The superior court then granted summary judgment to the Defendant doctors on this claim as well. Dr. Odom appeals pro se the denial of the continuance and the summary judgment.[5]

## III. DISCUSSION

### A. Breach of Contract

The superior court granted summary judgment to the Defendant doctors on all of Dr. Odom's breach of contract claims. We review the superior court's decision de novo. *See Farmer v. State,* 788 P.2d 43, 46 n. 8 (Alaska 1990). Dr. Odom is entitled to have the record reviewed in the light most favorable to him, and to have all reasonable inferences drawn in his favor. *See Metcalfe Invs., Inc. v. Garrison,* 919 P.2d 1356, 1360 (Alaska 1996).

There are three issues of material fact which the superior court should not have decided on summary judgment: (1) who committed the first material breach; (2) whether the Defendant doctors violated the covenant of good faith and fair dealing; and (3) whether the Defendant doctors had modified the contract, through course of dealing, to permit Dr. Odom's conduct.

#### 1. Materiality of the breach

Dr. Odom argues the superior court erred in holding that he breached the Rota-

---

5. The other doctors point out in their briefing that Dr. Odom filed a second suit in Fairbanks superior court, *Odom v. Fairbanks Memorial Hospital et al.,* Case No. 4FA–95–3001. In that suit Dr. Odom raises claims similar to the ones included in this suit, but which stem from the administrative proceeding in which FMH revoked his staff privileges. The other doctors are included among the fifteen defendants in that case.

That case is now on appeal to this court, docketed as 999 P.2d 123 (Alaska 2000). We make no determination of the effect of our resolution of this case on the issues raised in that appeal.

tion Agreement on October 4, 1993, by refusing to cover the second operating room staffed by CRNA Wilson. Dr. Odom argues that the Defendant doctors breached the agreement first by requiring him to work with an inadequate CRNA and by ignoring his requests to resolve the situation that had developed with CRNA Wilson. The superior court concluded that because the parties' responsibility to follow the rotation schedule was the foundation of the contract, Dr. Odom's breach was sufficient to excuse performance by the Defendant doctors.

The contract between the doctors specifically provided that each doctor had the responsibility for providing *locum tenens* coverage for his own absences. Had Dr. Odom been on vacation and failed to arrange for coverage in his absence, the superior court would have been correct that Dr. Odom's breach was the first material breach. The superior court concluded that because Dr. Odom was not excused from performance because of an emergency, and because he knew of his problem with CRNA Wilson, he could have provided *locum tenens* coverage during his absence. However, this conclusion does not address the issue of fact raised by Dr. Odom, which is that he had no choice but to accept the CRNAs provided through Anesthesia Associates, Inc., and that Anesthesia Associates, Inc. had the responsibility to supervise them.[6]

Dr. Odom argues that the Defendant doctors who had supervisory power over CRNA Wilson committed the first breach. When Dr. Odom notified Dr. Lee of the problem, Dr. Lee took no action. Dr. Odom explained he expected that when he refused to take the two operating rooms it would force the Defendant doctors to meet with him and resolve the problem. Instead the Defendant doctors met without Dr. Odom and excluded him from the contract.

The answer to the question of who committed the first material breach depends on who had supervisory control over the CRNAs. If it was the corporation owned by Drs. Lee

and McGregor, it was their responsibility to solve the problem with CRNA Wilson.

Although Anesthesia Associates, Inc. employed the CRNAs, the Defendant doctors claim that it is each doctor's responsibility to supervise the CRNA under his control. The Defendant doctors admit the CRNAs are "nominally employed" by the corporation, and that the corporation withholds employment taxes from the nurses' paychecks. Anesthesia Associates, Inc. billed each doctor for his use of the CRNAs and issued paychecks to the CRNAs.

The superior court questioned the parties about this. Based on the superior court's questions of Dr. Odom, the superior court apparently concluded that Dr. Odom was under no obligation to use CRNA Wilson and that he could have employed a different CRNA, or even gotten another doctor, outside the Rotation Agreement, to cover his other operating room. This conclusion decides a genuine issue of material fact; whether Dr. Odom was obliged to use the CRNAs provided by Anesthesia Associates, Inc.

Several facts alleged by Dr. Odom support his argument that he had no choice but to work with the CRNAs provided by the corporation. Dr. Perisho, one of the Defendant doctors, stated in an affidavit that after the incident between Dr. Odom and CRNA Wilson, the Defendant doctors told Dr. Odom, "if he would continue in the rotation under the terms of the original agreement, and work with the CRNA's as scheduled, he would be welcome back in the rotation." This statement tends to shows that the Defendant doctors believed the Rotation Agreement required accepting the CRNAs provided.

Dr. Odom stated in his deposition that at the time the five doctors negotiated the initial Rotation Agreement, there was some concern about continued employment for the CRNAs that had been working with Drs. Lee and McGregor. In his affidavit, Dr. Odom states that the CRNAs were retained to ensure that they would continue to have jobs and to protect Drs. Lee and McGregor's investment in their employees.

6. There were three CRNAs employed by Anesthesia Associates, Inc. at the time of this dispute. Dr. Odom requested the third CRNA replace

Wilson on October 5. However, the third CRNA was unavailable.

The Rotation Agreement itself also indicates that Dr. Odom did not have any choice but to use the CRNAs. It provides for the CRNAs to provide replacements for themselves if they need time off, when they are scheduled to work. It also provides for an alteration of the rotation for the doctors if all of the CRNAs are on vacation at the same time.

Finally, in the memo written on the day of the incident with CRNA Wilson, the Defendant doctors indicated to the Chief of Staff that by refusing to supervise the CRNAs, Dr. Odom had failed to uphold the Rotation Agreement. This tends to show the Defendant doctors believed that it was a provision of the Rotation Agreement to accept the CRNAs employed by Anesthesia Associates, Inc.

Reviewing the facts in the light most favorable to Dr. Odom, he refused to handle two operating rooms when one room was staffed by a CRNA who had refused to cooperate with him during a Propofol Infusion. He asked the surgical secretary, who had filled vacancies on the anesthesia rotation for five years, to ask the number two doctor on the rotation to assume responsibility for the second operating room. He believed the matter could be resolved before the next time he was number one on the rotation and required to take both operating rooms. Dr. Odom attempted to enlist the help of Dr. Lee in correcting CRNA Wilson and failed. He believed his action of refusing to work with her would force a meeting to resolve the situation.

Whether Dr. Odom's breach was the first material breach is a genuine issue of material fact, depending on who was responsible for supervising the CRNAs and whether Dr. Odom was obligated to work with them under the terms of the Rotation Agreement. The superior court erred in granting summary judgment on this issue.

### 2. *Good faith*

■ Dr. Odom argues that because he was acting in good faith in seeking to call the problem with CRNA Wilson to the attention of the Defendant doctors and to rectify the problem, that the Defendant doctors acted in bad faith by treating Dr. Odom's action as breach of contract. On October 5 the Defendant doctors met without Dr. Odom and, without consulting him, they decided to exclude him from the Rotation Agreement. The Defendant doctors' bad faith, Dr. Odom argues, is further evidenced by FMH reinstating his staff privileges in full after twenty-four hours. In a memo the Defendant doctors sent to the Chief of Staff, they state that "[i]t is a further concern of the below signed that patient care is being jeopardized by Dr. Odom's professional practice of medicine." There is no indication whether that statement reflects their concern over Dr. Odom's refusal to follow the rotation, or whether there were other motives which caused them to contact the Chief of Staff about Dr. Odom's staff privileges at FMH. The superior court should not have resolved by summary judgment the issue of whether the Defendant doctors acted in bad faith.

### 3. *The course of dealing*

■ Dr. Odom gave the superior court two examples of how the Rotation Agreement had been modified by a doctor's unavailability in the past. One was a medical emergency where a doctor could not leave a patient to cover his assigned operating rooms, and the other was a health emergency where one doctor was too ill to take responsibility for his rooms.

The Defendant doctors argue that even if the course of dealing had changed or modified the Rotation Agreement terms for dealing with "unavailability," there is nothing to suggest that the course of dealing modification would cover a dispute over supervision of the CRNAs where Dr. Odom was clearly available.

The superior court concluded that any modification that may have been made to the Rotation Agreement reached only unexpected emergencies, and that there was no factual basis to conclude it was modified to authorize Dr. Odom's behavior. It is true that Dr. Odom was available to cover both operating rooms, and that he elected not to because of his problems with CRNA Wilson. However, Dr. Odom raised a question of fact whether it

was reasonable for him to assume that he could cover his operating rooms in the manner that had been used before, if in fact he was obligated to use the CRNAs provided by Anesthesiology Associates, Inc. Whether Dr. Odom's conduct was reasonable hinges on the resolution of who supervised the CRNAs and whether Dr. Odom had any other choice but to employ them under the terms of the Rotation Agreement.

### B. Tortious Interference with Contract

The superior court granted summary judgment on this issue from the bench. The court concluded that the contract at issue was the one between the doctors and FMH. The superior court concluded that there had been no breach of any obligation running to FMH. Based on the lack of breach, the superior court determined there could be no tortious interference with contract.

■ To establish a tortious interference with contract claim, Dr. Odom must show: (1) an existing contract between him and a third party; (2) the Defendant doctors' knowledge of the contract and intent to induce a breach; (3) breach; (4) wrongful conduct of the Defendant doctors which caused the breach; (5) damages; and (6) the Defendant doctors' conduct was not privileged or justified. *See Geolar, Inc. v. Gilbert/Commonwealth Inc. of Michigan*, 874 P.2d 937, 940 (Alaska 1994).

■ Dr. Odom argues that the superior court was looking at the wrong contract. Since there can be no tortious interference claim among parties to the same contract, the superior court should not have considered the contract between the doctors and FMH. Dr. Odom is arguing that the Defendant doctors tortiously interfered with his contract for hospital privileges at FMH.

Those privileges were revoked for twenty-four hours after the Defendant doctors sent a letter to the Chief of Staff, informing him that Dr. Odom had "disrupted the smooth operation of the O.R. schedule" and disregarded the Rules and Regulations.

■ The Defendant doctors claim that Dr. Odom failed to raise this argument below. Dr. Odom's complaint is not specific about which contract he is alleging was interfered with. However, Dr. Odom did not have an opportunity to elaborate on this issue when the superior court ruled from the bench. There is no prejudice to the Defendant doctors in considering the issue.

Dr. Odom's attempt to establish his claim of tortious interference was cut short when the superior court ruled from the bench, based on its apparent misunderstanding of which contract was at issue. Dr. Odom should be allowed to develop this claim on remand.

### C. Antitrust/Unfair Trade Practices

In his complaint, Dr. Odom alleges conspiracy to restrain trade, in violation of AS 45.50.562,[7] monopolization, in violation of 45.50.564,[8] and unfair trade practices, in violation of 45.50.566.[9]

■ This court is guided by federal Sherman Act cases in construing the Alaska antitrust law. *See West v. Whitney–Fidalgo Seafoods, Inc.*, 628 P.2d 10, 14 n. 6 (Alaska 1981). Claims brought under AS 45.50.562 are also referred to as Sherman Act § 1 claims; claims under AS 45.50.564 have been termed Sherman Act § 2 claims. Section 1 of the Sherman Act prohibits unreasonable restraints on trade. *See* 15 U.S.C. § 1 (1997); *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 99

7. AS 45.50.562 provides:
   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is unlawful.

8. AS 45.50.564 provides:
   It is unlawful for a person to monopolize, or attempt to monopolize, or combine or conspire with another person to monopolize any part of trade or commerce.

9. AS 45.50.566 provides:

It is unlawful for a person to ... make a ... contract for sale of ... services, ... on the condition, agreement, or understanding that the ... purchaser will not use or deal in the ... service of a competitor or competitors of the ... seller, if the effect of the ... contract for sale, or of the condition, agreement, or understanding may be substantially to lessen competition or tend to create a monopoly in any line of commerce.

L.Ed.2d 808 (1988) (recognizing that § 1 of the Sherman Act "was intended to prohibit only unreasonable restraints of trade"). Federal courts have interpreted this prohibition two ways: (1) under a per se rule, where certain activities are considered illegal, with no requirement to prove actual damage to competition, or (2) under the "rule of reason." *See Federal Trade Comm'n v. Indiana Fed. of Dentists*, 476 U.S. 447, 457–58, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). Dr. Odom's brief criticizes the superior court for applying "some nebulous 'rule of reason' not recognized in any authority on the subject." The rule of reason has been uniformly adopted by federal courts, and there is a presumption in favor of applying this standard. *See Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 726, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Under the rule of reason test "[a]fter the claimant has proven that the conspiracy harmed competition, the fact finder must balance the restraint and any justifications or pro-competitive effects of the restraint in order to determine whether the restraint is unreasonable." *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1445 (9th Cir.1988). A contract between a hospital and a group of anesthesiologists is not considered a per se violation of the Sherman Act. *See Jefferson Parish Hosp. v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). The rule of reason thus applies to this case.

■ Sherman Act cases of this kind generally must be determined on the facts of each case. *See Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 579, 45 S.Ct. 578, 69 L.Ed. 1093 (1925). This court has noted the United States Supreme Court's admonition that summary judgment should be used sparingly in antitrust litigation. *See KOS v. Alyeska Pipeline Serv. Co.*, 676 P.2d 1069, 1073 (Alaska 1983) (citing *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)). When an antitrust plaintiff has established a prima facie case, he should have an opportunity to prove the necessary supporting facts at trial. *See id.*

■ To establish a prima facie case of unlawful restraint of trade Dr. Odom must initially prove three elements: "(1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually injures competition." *Oltz*, 861 F.2d at 1445. Only after Dr. Odom proves these three elements is it incumbent upon the fact finder to "balance the restraint and any justifications or pro-competitive effects of the restraint in order to determine whether the restraint is unreasonable." *Id.*

■ An attachment to an affidavit Dr. Odom filed with his Verified Complaint, and re-filed in connection with the summary judgment proceedings, discloses that on the day Dr. Odom stated he would not work with CRNA Wilson until problems he perceived with her performance were resolved, Dr. Keith B. Gianni, Chief of Staff at FMH, summarily revoked Dr. Odom's hospital privileges, without prior notice. This was done at the request of the Anesthesia Department, which consisted of the contract Anesthesia Staff, i.e., the Defendant doctors, that had the Anesthesiologist Agreement with FMH. Their unverified memorandum to Dr. Gianni, which listed as its subject "Physician Behavior," stated no more than that "[Dr. Odom's] behavior has disrupted the smooth operation of the O.R. schedule and is in disregard of the Rules and Regulations, to which we have all agreed and signed." In a similarly conclusory manner they state that "[i]t is further a concern of the below signed that patient care is being jeopardized by Dr. Odom's professional practice of medicine." Apparently Dr. Gianni made no independent verification of the issues raised by the contract Anesthesia Staff. The afternoon following the episode involving Dr. Odom's admitted refusal to work with CRNA Wilson, Dr. Perisho, Chairman of the FMH Department of Anesthesia, one of the contract Anesthesia Staff as well as a Defendant doctor, sent a memorandum to Dr. Odom. The memorandum recites that he and Drs. Mancil, Lee, McGregor, and Stinson, who constituted the contract Anesthesia Staff under the Anesthesiologist Agreement with FMH, had met and decided that:

1. Dr. Odom has violated anesthesia contract [with FMH] and rules and regulations [of the Anesthesia Staff].

2. The [Anesthesia Staff] wishes not to continue Dr. Odom as a party to the agreement [with FMH].

3. Effective immediately Dr. David Odom will be an independent and solo practitioner with responsibility to maintain privileges according to the medical staff bylaws. He may do cases on request both scheduled and emergency. It should be understood that if Dr. Odom is not specifically requested, Anesthesia [S]taff as part of the [A]nesthesiologist [A]greement will provide the anesthesia services and follow the revised rules and regulations parallel to the past.

4. Issues regarding quality assurance review and recommendations made to Dr. Odom must continue to be addressed by Dr. Odom.

The next day Dr. Gianni, Chief of Staff, sent Dr. Odom a memorandum in which Dr. Gianni stated that "[y]our summary suspension issued yesterday has expired and I have elected not to continue it." The crisis that presumably had justified Dr. Odom's summary suspension without notice, and thus terminated Dr. Odom's responsibilities under the Anesthesiologist Agreement, had thus resolved. However, Dr. Gianni also stated that "[y]ou have your former privileges in full; specifically, you may render anesthesia care when so asked by another physician or patient."

In his affidavit, Dr. Odom swears that:

After the meeting with the Defendants, I met with Gingerich to determine whether FMH would continue to allow me to practice and, more particularly, would the hospital provide me with a pro-rated portion of the anesthesia practice. Gingerich advised me that my privileges at the hospital would remain valid, however, the hospital would not give me a pro-rated portion of the anesthesia practice, since it had a contract with the Defendants. Gingerich did indicate that if I was specifically name requested by a physician, hospital staff would permit the scheduling. The effect of Defendants' conduct was to eliminate my practice of medicine in Fairbanks.

According to this affidavit, Dr. Odom later sent a letter to Gingerich

requesting that I be permitted to continue sharing on a pro-rated basis in the anesthesia practice at FMH and that steps be taken to resolve the dispute between myself and the Defendants.... Gingerich did not respond in writing to my correspondence, however, verbally he told me that he would not intercede and would not allow me a pro-rated portion of the anesthesia practice.

In the same affidavit, Dr. Odom swears that:

The gross value of anesthesiology services provided at FMH is approximately Three Million ($3,000,000) Dollars per year. In the past five years, surgeons have not been permitted to name request anesthesiologists. Although this practice has changed, neither the surgeon nor the patient is advised that they have a choice of anesthesiologists, the names of the anesthesiologists, or the rates which each anesthesiologist charges. Because of past practice and the present lack of information, almost all anesthesia will go to the Defendants because FMH does not provide or permit otherwise. The Defendants have had a contract with FMH every year that I have been here, since 1989, except for 1991 and 1992. Despite not having a contract in 1991 and 1992, the anesthesiologists continued the rotation system and pro-rated the anesthesia practice. During these years, total gross revenues have been about the same—meaning that each anesthesiologist receives approximately Five Hundred Thousand ($500,000) Dollars annually. Since I am now precluded from the Anesthesia Agreement, my portion of these gross revenues (approximately Five Hundred Thousand ($500,000) Dollars) is being taken by the Defendants and divided among themselves—essentially each of them picks up another One Hundred Thousand ($100,000) Dollars, at my expense.

The Defendant doctors argued to the superior court that the "Anesthesiologist Agreement at issue provided benefits to the

community outweighing any concomitant restraint on commerce." The superior court agreed, determining that the Anesthesiologist Agreement did not constitute a conspiracy in restraint of trade:

It's not clear to me, and it's not necessary to decision in this case, whether that contract—now we're talking about again the contract between the [anesthesiologists] and FMH—would be viewed as an anti-trust violation outside the context of this case. But the specific context of this case, that is contract for the provision of medical services, makes it pretty clear to me that no such violation occurred here, even colorably. It's certainly in the public interest that the coverage that we're talking about here be provided reliably and constantly. It's pretty clear that, given the rule of reason, there is no anti-trust violation even though there may have been some combination that somehow acted to restrict free trade and free competition in the area.

See Oltz, 861 F.2d at 1449 (noting that "[t]he rule of reason requires an evaluation of each challenged restraint in light of the special circumstances involved").

Viewing the record in the light most favorable to Dr. Odom, and drawing all reasonable inferences in his favor, a jury could find that the Defendant doctors had engaged in a conspiracy to restrain trade, had attempted to monopolize the anesthesiology practice at FMH, and had engaged in trade practices the effect of which was substantially to lessen competition or tended to create a monopoly in the anesthesiology practice at FMH. Thus Dr. Odom has presented sufficient evidence to establish prima facie statutory causes of action against the Defendant doctors.

In briefing before this court, the Defendant doctors note that the rule of reason "requires an evaluation whether, under all the circumstances of the case, the restrictive practice imposes an unreasonable restraint on competition." As noted, they argue that the public interest benefits flowing from the Anesthesiologist Agreement satisfy the rule of reason.

Dr. Odom has sworn that during a two-year interval there was no contract between the anesthesiologists and FMH, from which it could be inferred that any public interest benefits flowing from the contract, which largely consisted of the assurance of reliable and constant anesthesiology coverage at all times, could be achieved without a contract. He also has sworn that it was the practice of FMH to prohibit surgeons from "name requesting" an anesthesiologist, a practice that had been replaced by the policy of simply not advising surgeons or patients that they could "name request" an anesthesiologist. Balancing the restraint of competition against the public interest also is a question of fact to be determined by the jury. It is not a determination to be made on summary judgment.

## IV. CONCLUSION

The summary judgment is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

EASTAUGH, Justice, not participating.