SISTERS OF PROVIDENCE IN WASH-INGTON, d/b/a Providence Hospital, Anchorage, a Washington nonprofit corporation, and Providence Anchorage Anesthesia Medical Group, Appellants,

v.

A.A. PAIN CLINIC, INC., an Alaska corporation, Michael T. Borrello, M.D., and Alaska Pain Management Clinic, LLC, Appellees.

A.A. Pain Clinic, Inc., and Michael T. Borrello, M.D., Cross–Appellants,

v.

Sisters of Providence in Washington, d/b/a Providence Hospital, Anchorage, a Washington nonprofit corporation, Providence Anchorage Anesthesia Medical Group, and Alaska Pain Management Clinic, LLC, Cross–Appellees.

Nos. S–10390, S–10419.

Supreme Court of Alaska.

Dec. 19, 2003.

---

**15.** *O.K. Lumber,* 759 P.2d at 527.

John A. Treptow, Jeffrey J. Jarvi, Dorsey & Whitney LLP, Anchorage, for Appellants and Cross–Appellees.

Richard W. Maki, David H. Shoup, Tindall Bennett & Shoup, Anchorage, for Appellees and Cross–Appellants A.A. Pain Clinic, Inc., and Michael T. Borrello.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

Sisters of Providence in Washington, d/b/a Providence Hospital Anchorage ("Providence"), entered into an exclusive contract with Providence Anchorage Anesthesia Medical Group ("the Group") for chronic pain management services. Leon Chandler, M.D., and Michael Borrello, M.D., are anesthesiologists who were excluded by the contract and claim to have been harmed by it. They sued for anti-competitive conduct and received a jury award that was in part set aside by the trial court. This case involves a number of challenges to the verdict and to the trial court's rulings.

**BACKGROUND**

The following facts appear to be uncontested. In 1989 Dr. Leon Chandler launched

A.A. Pain Clinic, Inc. ("A.A.Pain")[1] to devote more of his practice to pain management.[2] Within the relevant time periods Chandler has also had medical staff privileges at Providence.

On August 25, 1992, Providence and the Group finalized an agreement ("1992 exclusive") granting the Group exclusive rights to provide "anesthesia services" at Providence for two years. The 1992 exclusive defined "anesthesia services" as "the practice of medicine dealing with the management of procedures for rendering a patient insensitive to pain and emotional stress during surgical, obstetric, and other medical procedures and the support of life functions under the stress of anesthetic and surgical procedures." Nothing in the contract indicated that chronic pain management and treatment, as opposed to acute pain treatment, was within its range of services—a possibility previously considered but apparently not adopted by the Group.

In April 1994 the Group hired Dr. James Laidler, an anesthesiologist trained in chronic pain management. Also around that time, the Group opened up its own chronic pain treatment facility, the Alaska Pain Management Clinic, LLC ("APMC").

Providence and the Group renewed and amended their exclusive contract in 1994 ("1994 exclusive"), for the first time including "pain management" within the professional services definition. Also new to this definition was a provision stating, "[n]otwithstanding the above, this agreement is not intended to reduce or limit the existing practice of Dr. Leon Chandler."

Though expressing concerns about the impact the exclusive would have on his practice, Chandler chose not to join the Group before or after either the 1992 or 1994 exclusive. He did however communicate his concerns in at least two letters in 1994 to Dr. Michael Norman, Chief of Anesthesia Department at Providence, and a prominent shareholder of the Group. In those letters Chandler asked for an assurance in writing which would delineate his established privileges at the hospi-

tal, as it was his understanding that he was being "grand-fathered in to do pain management at Providence." He also inquired about the privilege status of his colleague, Dr. Swift, suggesting that Swift was needed to cover any problems that might arise when Chandler was out of town.

In January 1995 Providence and the Group signed a "Letter of Understanding," indicating that it came in direct response to questions raised by Chandler: "He is specifically concerned about whether his privileges are being reduced and whether he will be able to obtain coverage for his patients during his absence." The Letter of Understanding purported not to affect Chandler's existing privileges at Providence and further stated that doctors having "the appropriate medical staff privileges" would be allowed to cover for Chandler during his absence.

In August 1995 A.A. Pain hired anesthesiologist Dr. Michael Borrello. Borrello immediately applied for clinical privileges for both anesthesia and pain management at several hospitals, including Providence. Providence granted him limited privileges confined to covering Chandler's patients when Chandler was out of town.

Meanwhile, APMC had problems retaining the services of its chronic pain management physicians and twice had to shut down operations for lack of specialists. During the closures some pain management patients were referred to Chandler.

In February 1998 Chandler's patient S.H., a "more or less" comatose woman suffering from severe spasticity, required a treatment intended to reduce her condition. Because he was leaving on vacation the next day, Chandler referred S.H. to Borrello. Borrello scheduled the procedure at Providence, but because Chandler had by that time returned from vacation, Providence canceled the procedure in response to objections from the Group's Dr. Norman. Chandler (through A.A. Pain) and Borrello immediately filed a complaint together with a motion for a temporary restraining order. The motion was

---

**1.** A.A. Pain was eventually incorporated in 1994.

**2.** Chandler describes his chronic pain management practice as the application of anesthesiology techniques to the treatment of chronic pain.

granted and the procedure was performed at Providence after at least a one-day delay. The initial complaint was then twice amended, pleading the claims that are the subject of this appeal.

In October 1998 Providence and the Group removed the clause regarding chronic pain management from their exclusive contract, and since November 1, 1998, both Borrello and Chandler have had full privileges at the hospital.

## PROCEEDINGS

Borrello and Chandler (through his professional corporation A.A. Pain Clinic, Inc. ("Chandler")) sued Providence, the Group and APMC for various types of anti-competitive conduct. Their amended complaint included common law claims for intentional interference with a contract, intentional interference with prospective economic advantage, breach of contract, and breach of the implied covenant of good faith and fair dealing. They also pleaded two state anti-trust claims, one for unreasonable restraint of trade in violation of AS 45.50.562, and one for attempted monopolization in violation of AS 45.50.564.

A jury trial ensued. On a special verdict form the jury reached a verdict that was generally favorable to the plaintiffs. The jury found that the defendants had unreasonably restrained trade and that as a result Chandler had been damaged in the sum of $44,958 by Providence and in the sum of $89,916 by the Group. The jury found that Chandler had not been damaged by APMC by an unreasonable restraint of trade, and that Borrello had not been damaged by any of the defendants by reason of an unreasonable restraint of trade. The jury also found that at least one of the defendants had engaged in predatory or exclusionary conduct with a specific intent to achieve monopoly power, but there was no probability that such a defendant would achieve its goal of monopoly power in the relevant market. In view of this, the jury did not assess damages under the attempted monopolization claim.

As to the tort claims, the jury found that all three defendants had intentionally interfered with a contract between Chandler and patient S.H. The jury also found that the

Group, but not APMC, had intentionally interfered with a contract between Borrello and Providence. As to the claim of intentional interference with prospective economic advantage, the jury found that only the Group had intentionally interfered with Chandler and Borrello's prospective economic advantages. Three contract claims were presented. The jury found Providence did not breach its medical staff agreement with Borrello, nor did it breach the covenant of good faith and fair dealing in a contract with Borrello. The jury found that Providence breached the covenant of good faith and fair dealing in a contract with Chandler.

The jury assessed damages on the tort and contract claims as follows: in favor of Chandler against Providence, $292,480; in favor of Chandler against the Group, $292,480; in favor of Chandler against APMC, $146,240; in favor of Borrello against the Group, $365,600.

Subsequent to the verdict the defendants moved for judgment notwithstanding the verdict ("j.n.o.v."). The court granted their motion in part. Specifically, the court granted j.n.o.v. as to the award of $292,480 in favor of Chandler against Providence for breach of the covenant of good faith and fair dealing. The court concluded that there was no evidence that A.A. Pain, as distinct from Chandler personally, had a contract with Providence. That same damages award also included Chandler's successful claim against Providence for intentional interference with the S.H. contract. The superior court vacated this claim as well because it found that Chandler had not presented any evidence as to the monetary loss arising from interference with this contract. For the same reason, the court also granted j.n.o.v. on the verdict for Chandler against APMC for $146,240 for intentionally interfering with the contract between Chandler and S.H. But the court did not grant j.n.o.v. as to Chandler's $292,480 award against the Group based on intentional interference with the S.H. contract. The court found that even though this particular claim lacked evidentiary support as to damages, the monetary award also included Chandler's claim against the Group for interference with prospective economic

advantage and adequate evidence supported the award in full for this latter claim.

Ultimately, final judgment was entered as follows:

- Chandler against Providence—$44,958 in antitrust damages, trebled to $134,874.
- Chandler against the Group—$89,916 in antitrust damages, trebled to $269,748.
- Chandler against the Group—$292,480 in tort damages for intentional interference with prospective economic advantage.
- Borrello against the Group—$365,600 in tort damages for intentional interference with prospective economic advantage and intentional interference with the medical staff agreement between Borrello and Providence.

Attorney's fees were awarded as follows:

- Full reasonable attorney's fees of $252,862.50 under the antitrust statute in favor of Chandler and Borrello against Providence and the Group, jointly and severally.
- Partial fees under Civil Rule 82 of $33,183.25 in favor of APMC against Chandler and Borrello, jointly and severally.

## ISSUES ON APPEAL AND CROSS–APPEAL AND SUMMARY OF DECISION

Providence and the Group have appealed, and Chandler and Borrello have cross-appealed. The issues on appeal and on cross-appeal and summaries of our decision concerning each issue are set out below.

### Appeal Issues

1. For the sixth element of the claim of intentional interference with prospective advantage, did the court err in failing to instruct the jury that the plaintiffs had the burden of proving the absence of privilege?

**Decision:** No, the jury was properly instructed that the plaintiffs had this burden.

2. Was the evidence sufficient to satisfy the elements of the plaintiffs' claims of intentional interference with prospective economic advantage?

**Decision:** Yes, the evidence was sufficient as to each element.

3. Was the evidence sufficient to satisfy the elements of Chandler's claim of restraint of trade?

**Decision:** Yes, the evidence was sufficient as to each element.

4. Was the evidence sufficient to warrant an award of lost profits to the plaintiffs?

**Decision:** Yes, the evidence was sufficient.

5. Was the award of attorney's fees to both Chandler and Borrello under the full reasonable fee standard of the antitrust act erroneous because only Chandler prevailed on an antitrust theory?

**Decision:** The award was erroneous as to Borrello since he did not prevail on his antitrust claims. He is entitled to attorney's fees under Civil Rule 82 against the Group but not against Providence.

### Cross–Appeal Issues

1. Did the court err in granting j.n.o.v. in favor of APMC and Providence on Chandler's claim of intentional interference with contractual relations?

**Decision:** Yes, Chandler showed a compensable injury for loss of professional time due to the delay of S.H.'s procedure and was at least entitled to nominal damages for this loss.

2. Did the court err in granting j.n.o.v. in favor of Providence on Chandler's claim of violation of the implied covenant of good faith and fair dealing on the ground that Providence's contract was with Chandler rather than A.A. Pain?

**Decision:** Yes, the court erred because Chandler was practicing through A.A. Pain as his professional corporation.

3. Did the court err in awarding prevailing party fees of $33,183.35 to APMC?

**Decision:** As to Chandler, the court should consider whether APMC was a prevailing party in light of our decision that the grant of j.n.o.v. in favor of APMC on Chandler's claim of intentional interference with contractual relations was erroneous. As to Borrello, the court did not abuse its discretion in making the award. The fact that APMC had an indemnity agreement with

Providence under which APMC did not have to pay its own fees did not require that fees not be awarded to APMC. We proceed to a discussion of these issues in the order that they are set forth.

### Appeal Issue 1 Did the court err in failing to instruct the jury that the plaintiffs had the burden of proving the absence of privilege element of the intentional interference with prospective advantage tort?

■ This issue and the second issue involve the tort of intentional interference with prospective economic advantage. We have identified six elements of this tort. There must be sufficient evidence that: (1) a prospective business relationship existed; (2) the defendant knew of the prospective relationship and intended to prevent its fruition; (3) the prospective business relationship did not culminate in pecuniary benefit to the plaintiff; (4) the defendant's conduct interfered with the prospective relationship; (5) the interference caused the plaintiff's damages; and (6) the defendant's conduct was not privileged or justified.[3]

■ Providence and the Group claim that the trial court improperly instructed the jury as to the sixth element by placing on them the burden of proving that their conduct was privileged or justified rather than requiring Chandler and Borrello to prove that the defendants' conduct was not privileged or not justified.[4] The trial court indicated in a pretrial ruling that the defendants should have the burden of proving that their conduct was privileged or justified. Instructing the jury in accordance with such a ruling would be erroneous, because the absence of justification or privilege is an element of the

tort. Typically the burden is placed on a plaintiff to prove each element of a tort. Specifically, we have stated that "the plaintiff must prove" each of the six elements of the tort.[5] But an examination of the jury instructions as given does not reflect that the jury was instructed that the burden of proving privilege or justification was on the defendants.

■ An instruction on burden of proof tells the jury which party must lose if the jury is not persuaded that a particular set of circumstances existed.[6] For the following reasons, we conclude that the jury was instructed that if it did not find that the defendants' conduct was not privileged the plaintiffs must lose, and thus the burden of proof was properly allocated to the plaintiffs.

■ An instruction that tells a jury that if it finds that each element of a tort has been proved it must find for the plaintiff, but if it finds otherwise it must find for the defendant, places on the plaintiff the risk of losing if the proof is insufficient. Such an instruction allocates the burden of proof to the plaintiff even if no mention of burden of proof is made. The challenged instruction in this case contained this structure.

■ There was no general burden of proof instruction. But the instruction pertaining to the intentional interference tort told the jury that if it found that the first five elements of the tort were proven by the plaintiffs by a preponderance of the evidence, then the jury would have to decide "if the defendants' conduct was legally justified or privileged."[7] The instruction went on to say that if the jury decided that the five elements were established and "that the defendants' conduct was not legally justified or privileged" then a verdict must be returned in favor of the

---

3. *Odom v. Fairbanks Mem'l Hosp.*, 999 P.2d 123, 132 (Alaska 2000); *Oaksmith v. Brusich*, 774 P.2d 191, 198 (Alaska 1989).

4. "We review de novo jury instructions to which timely objection was made.... A jury instruction containing an erroneous statement of law constitutes reversible error if it prejudices one of the parties; prejudice exists if it can be said that the verdict may have been different had the erroneous instruction not been given." *Reich v. Cominco Alaska, Inc.*, 56 P.3d 18, 25 (Alaska 2002).

5. *Fairbanks Mem'l Hosp.*, 999 P.2d at 132.

6. *United Bank Alaska v. Dischner*, 685 P.2d 90, 93 (Alaska 1984) (the party bearing the burden of proof "bears the risk of losing if the trier of fact is not persuaded").

7. Jury Instruction No. 59 provided:
 Plaintiffs' fourth theory of recovery is intentional interference with prospective economic advantage. In order to recover on this claim, plaintiffs [Dr. Chandler] and Dr. Borrello must prove the following five things by a preponderance of the evidence:
 1. a prospective business relationship existed between plaintiffs and patients;

plaintiffs; but if the jury found "otherwise," a verdict for the defense was required. With the word "otherwise" the court addressed the subject of what should be done if the jury failed to find that defendants' conduct was not justified or privileged. In that event the jury was instructed that it must find for the defendants.[8]

Thus the jury was told that if it found that all six elements of the tort had been proved it should find for the plaintiffs; if not, it should find for the defendants. The instruction properly placed on the plaintiffs the risk of losing if any element was not proved. Although not a model of clarity, the instruction was legally sufficient to allocate the burden of proof to the plaintiffs.

### Appeal Issue 2 Was the evidence sufficient to satisfy the elements of the plaintiffs' claims for intentional interference with prospective economic advantage?

The appellants' first contention here is that the tort of interference with a prospective economic advantage requires specifically identified third parties and that interfering with a doctor's ability to form a professional relationship with patients who are unidentified at the time of the challenged conduct is insufficient.

■ We have not so limited this tort. We have described it in the following terms: "Under the theory of intentional interference with prospective economic advantage, 'a person who is involved in an economic relationship with another, *or who is pursuing reasonable and legitimate prospects of entering such a relationship,* is protected from a third person's wrongful conduct which is intended to disrupt the relationship.' "[9] The highlighted language contemplates a broader range of third parties than merely those that are specifically identified.

■ The Group also argues that there was insufficient evidence to demonstrate any

2. defendants had knowledge of the prospective relationship and intended to prevent its fruition;

3. the prospective business relationship did not culminate in pecuniary benefit to plaintiffs;

4. defendants' conduct interfered with the prospective relationship; and

5. the interference caused the plaintiffs' damages.

If you find that plaintiffs have proven each of the above five things by a preponderance of the evidence, you have determined that defendants intentionally interfered with plaintiffs' prospective business relationship with patients. If you do not find that plaintiffs have proven each of the above five things by a preponderance of the evidence, you must return a verdict for the defendants on this claim.

If you decide it is more likely true than not true that all these things happened with respect to one or more of the defendants and one or more of the plaintiffs, then you must decide if the defendants' conduct was legally justified or privileged. I previously told you how to determine whether the defendants' conduct is legally justified or privileged .... [deleted orally]. If you decide that [it is] more likely true than not true as to all of these elements and you decide that the defendants' conduct was not legally justified or privileged, then you must return a verdict in favor of that plaintiff or plaintiffs and against that defendant or those defendants on this claim. Otherwise, you must return a verdict for the defendants on this claim.

I have already defined "intent" and "legal cause" for you. I have also instructed you on how to determine whether a defendant's conduct was legally privileged or justified.

The court instructed on how to determine whether a defendant's conduct was justified or privileged as follows. Jury Instruction No. 57 provided:

I will now instruct you on how to determine whether a defendant's conduct was justified or privileged. The law recognizes that certain kinds of conduct under certain circumstances are not improper, or in legal terms, are justified or privileged. A defendant's interference with a contract is justified or privileged when he has a direct financial interest related to the contract, and his conduct is predominately motivated by a desire to protect his economic interest. A defendant's conduct is not justified or privileged when it is motivated by spite, malice, or some other improper objective.

8. In the preceding sentence the jury was told that if it found the other five elements and that "defendants' conduct was not legally justified or privileged" it was to find in favor of plaintiffs. Even without the "otherwise" sentence, this phrasing implied that if the jury were to fail to find that the conduct was not legally justified it could not find in favor of the plaintiffs.

9. *Fairbanks Mem'l Hosp.*, 999 P.2d at 132 (quoting *Ellis v. City of Valdez*, 686 P.2d 700, 707 (Alaska 1984)) (emphasis added).

prospective business relationships.[10] We do not find this argument persuasive. Chandler testified that he began seeing a twenty percent decrease in referrals to his office after the 1994 exclusive went into effect. He explained in detail exactly how the referral process changed, and named one physician who stopped making referrals to Chandler's office. Chandler's testimony that he had heard of such a prohibition on referrals was corroborated by Providence employees. From this testimony, it would be reasonable for a juror to conclude that Chandler was seeking reasonable and legitimate business opportunities which were at least in part frustrated by defendants' actions. Furthermore, other testimony, such as that from one of Chandler's former patients, who described her frustrated attempts to have Chandler contacted, helped demonstrate that there was a class of third parties being affected by the interference. Coupled with the testimony regarding patient S.H., the evidence is sufficient; a reasonable juror could have resolved this element in favor of plaintiffs.

To satisfy the tort of intentional interference with prospective economic advantage, Chandler and Borrello also had to demonstrate that defendants were responsible for causing any prospective business relationship not to materialize.[11]

Contrary to the Group's suggestions that Chandler and Borrello only provided self-serving testimony, other evidence exists.

Two pieces of evidence implicate the Group by demonstrating a policy bent on centralizing the referral process to insure that only Chandler's former patients would see him. A memo to Providence nursing and supervisors staff stated:

(1) All orders for Pain Management will be referred to [the Group] pain MD by the nurse or health unit coordinator. . . .

(2) [The Group] pain doctor will determine if the patient has previously been seen by Dr. Chandler, and, if so, will inform him that his patient is here.

Providence's pain service clinician verified that this policy was in place throughout the entirety of the exclusive contract. There also exists evidence suggesting that this policy resulted in occasions where Borrello and Chandler were actually prevented from seeing their own patients. There was sufficient evidence for a reasonable juror to decide in favor of Chandler and Borrello.[12]

As discussed above, the superior court correctly instructed the jury that plaintiffs had the burden of proving the Group's actions were not privileged. The Group now argues that Chandler and Borrello were not able to satisfy that burden because no evidence demonstrated the Group was motivated by spite, malice, or some other improper objective. We disagree.

Plaintiffs presented evidence that Dr. Nor-

---

**10.** "In reviewing a superior court's ruling on a motion for JNOV, we will not weigh conflicting evidence or judge the credibility of witnesses. Rather we will determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment." *Blumenshine v. Baptiste*, 869 P.2d 470, 473 n. 3 (Alaska 1994). To the extent that a ruling on a motion for j.n.o.v. involves questions of law, those questions will be reviewed de novo. This standard applies to Appeal Issues 2 through 4 and Cross–Appeal Issues 1 and 2.

**11.** *Fairbanks Mem'l Hosp.*, 999 P.2d at 132; *Oaksmith*, 774 P.2d at 198.

**12.** Appellants make three additional arguments as to the loss of business element; all three are unpersuasive. They argue (1) that physicians, not hospitals, make referrals, (2) that Chandler and Borrello had no legal right to referrals, and (3) that Chandler's business was in fact growing

from 1995 to 1998 but made less money after the exclusive was lifted. As to the first, although the Group's argument may be true, it does not necessarily eliminate Providence from liability if, as evidence demonstrated here, Providence allowed the Group to impose itself as a clearinghouse for referrals by hospital employees. As to the second, though the doctors had no right to referrals, some Providence employees testified that they would have referred patients to Borrello and Chandler but for the exclusive, and that it would have been beneficial if more patients were referred to outside doctors. As to the third, the issue is not whether Chandler's business was growing, but rather whether Chandler demonstrated injury by producing evidence that he would have earned more money but for the exclusive. *See, e.g.*, PHILLIP E. AREEDA, HERBERT HOVENKAMP & ROGER D. BLAIR, II ANTITRUST LAW ¶ 396 (2d ed.2000).

man[13] held a personal grudge against Chandler based on a prior business association and lawsuit. While Norman disputed this inference, whether there was a grudge and, if so, its impact were jury questions. Other evidence was presented that members of the Group felt Borrello, as an associate of Chandler, was "tainted." One witness testified to overhearing Norman saying that "there was no way he was going to credential" Borrello because he "didn't want to give Chandler any extra help at Providence Hospital." Such evidence, coupled with the expressed intentions of Norman and other Group members to drive Chandler out of the hospital and out of business could have led a reasonable juror to decide in favor of defendants as to the privilege element.

The Group next argues that Chandler and Borrello's damages awards for intentional interference with prospective economic advantage were excessive because they exceed plaintiffs' own expert's estimates. The Group claims this expert's only testimony with regard to this claim referenced injuries stemming from lost referrals, estimating damages at $136,212 for Borrello and $116,256 for Chandler. But the jury eventually awarded $365,600 to Borrello and $292,480 to Chandler.

The Group concedes having not addressed this point at the j.n.o.v. stage. Thus it is only entitled to relief if we find plain error "so substantial as to result in injustice."[14]

▬▬ The superior court found that "there [was] an evidentiary basis for the award of damages to [Dr. Chandler] and to Dr. Borrello for the tort of intentional interference

with prospective advantage." We agree. The expert's testimony encompassed more than just referrals, also referencing "Medicare dumping" and restrictions on the doctors' practices, estimating additional damages exceeding the amount awarded. It would be reasonable for a juror to include these practices within the scope of the tort of intentional interference with prospective advantage, and to allow them to do so was not plain error.

### Appeal Issue 3 Was the evidence sufficient to satisfy the elements of Chandler's claim of restraint of trade?

▬▬ Alaska Statute 45.50.562 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is unlawful."[15] When appropriate, this court is guided by federal Sherman Act cases in construing Alaska antitrust law.[16]

▬▬ In order to establish a prima facie case under Alaska's restraint of trade statute, a plaintiff must prove three elements: (1) the existence of an agreement or conspiracy among two or more persons or distinct business entities; (2) intent on the part of those persons or entities to harm or restrain competition; and (3) the agreement or conspiracy actually injured competition in the relevant market.[17]

▬▬ Unless a case involves a per se violation,[18] most jurisdictions, including ours, utilize a "rule of reason" test to determine whether or not competition has actually been

---

13. Norman became medical director at the Group around 1994 and was also a shareholder. He also had ties to Providence Hospital, practicing there and holding the position of chairman of the anesthesia department.

14. *Shields v. Cape Fox Corp.*, 42 P.3d 1083, 1087 n. 8 (Alaska 2002).

15. AS 45.50.562; *Odom v. Lee*, 999 P.2d 755, 761 (Alaska 2000).

16. *Lee*, 999 P.2d at 761; *see also West v. Whitney–Fidalgo Seafoods, Inc.*, 628 P.2d 10, 14 n. 6 (Alaska 1981).

17. *Lee*, 999 P.2d at 762 (citing *Oltz v. St. Peter's Comty. Hosp.*, 861 F.2d 1440, 1445 (9th Cir. 1988)).

18. Most federal courts have determined that there are certain activities which are, per se, considered illegal. They do not require the plaintiff to prove actual damage to competition. *Lee*, 999 P.2d at 762.

Here both sides agreed—and still agree—with the superior court that there was no per se violation and thus the rule of reason test applied. *See Lee*, 999 P.2d at 762 ("[A] contract between a hospital and a group of anesthesiologists is not considered a per se violation of the Sherman Act.").

damaged:[19] "Under the rule of reason test '[a]fter the claimant has proven that the conspiracy harmed competition, the fact finder must balance the restraint and any justifications or pro-competitive effects of the restraint in order to determine whether the restraint is unreasonable.' "[20]

After the presentation of plaintiffs' evidence, the defense moved for directed verdict on the antitrust claim, attacking plaintiffs' case on several grounds. This motion was denied. After a jury verdict against both Providence and the Group on the antitrust claim, the defense again raised all their arguments in a motion for j.n.o.v., which was subsequently denied. Providence and the Group renew their arguments on appeal. In addition, they argue that Chandler failed to establish cognizable antitrust injury and antitrust standing.

Providence and the Group contend that "the critical question is where the consumer of chronic pain services can reasonably turn for alternative care"[21] and conclude that Chandler, in only describing "out-of-office" procedures performed at Providence, has not answered this question. They cite authority holding that one hospital is not a relevant market unless it "is the only one serving a particular area or offers unique set of services."[22] They claim Chandler provided no other information such as prices or patient volumes about other market participants, especially pain clinics, and conclude that the jury had no framework for deciding whether competition had been impaired.

▌ Appellants' representation of the evidence is deficient.[23] The evidence was replete with references to the pain services market, which for the relevant periods of time only contained two to four providers and did not extend outside the Anchorage area. Though this evidence comes from self-interested parties, that does not mean that it is presumptively worthless. Hard data is not necessarily required in antitrust cases. In *Oltz v. St. Peter's Community Hospital*, a case heavily relied on by this court in interpreting our antitrust statute, the Ninth Circuit stated that "the failure to pinpoint precisely the relevant market through detailed market analysis is not uniformly fatal to a claim under Sherman Act § 1."[24]

Furthermore, Chandler presented statistical evidence describing the market at trial. Chandler's estimates that around sixty to sixty-five percent of hospital patients in Anchorage "run through Providence" were corroborated by statistical data published by the Department of Health and Social Services and by Providence.[25] Though much of this evidence only considers hospital in-patients, Chandler testified that Providence retains a similar market percentage in out-patient services. We believe that a reasonable juror could conclude that this evidence demonstrates Providence's powerful position in the Anchorage area pain management market.

Providence and the Group next argue that Chandler failed to present any evidence that Providence and the Group entered into an

---

19. Federal courts have uniformly adopted the rule of reason test. This court embraced the rule of reason test in *Odom v. Lee*, 999 P.2d at 761–762. There is a presumption in favor of applying the rule of reason standard. *See Business Elecs. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 726, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988); *Lee*, 999 P.2d at 762.

20. *Lee*, 999 P.2d at 762 (quoting *Oltz*, 861 F.2d at 1445).

21. The appellants cite *Davies v. Genesis Med. Ctr. Anesthesia & Analgesia, P.C.*, 994 F.Supp. 1078, 1097 (S.D.Iowa 1998), for this proposition.

22. *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 877 (3d Cir.1995).

23. Defining the relevant market is a factual inquiry ordinarily reserved for the jury. *Oltz*, 861 F.2d at 1446.

24. 861 F.2d 1440, 1448 (9th Cir.1988).

25. Providence's own statistical data included in a strategic plan, albeit from 1990, lends credence to Chandler's testimony. It notes a 50% and still increasing share of the outpatient surgery market for its Surgery Center. It adds, "Surgery Center has long been the marketshare leader in outpatient surgery." That same report also notes that "Providence's outpatient volume is also increasing . . . with over 300 visits per day," although it does not give overall market figures. Finally, additional commentary and statistical evidence published by Providence around 1999 or 2000 indicates that Providence experienced growth between 1990 and 2000.

agreement[26] whose object was to harm or restrain competition.[27] They point out that simple competitive desires to maximize profits at the expense of rivals, to even drive competitors out of business, are not objective bases upon which antitrust liability may be found.[28]

As Professors Areeda and Hovenkamp note in their treatise on antitrust law, proving a conspiracy intended to harm competition is complicated by certain features inherent in any restraint of trade agreement: (1) conspirators will seldom admit to their unlawful agreement; (2) "behavior can sometimes be coordinated without any communications or other observable and reprehensible behavior"; and (3) the causal connection between observable acts and subsequent corroborating acts may be obscure.[29] Thus, courts will often have before them agreements which on their face offer legitimate and lawful profit-seeking motives.[30] Because of this, courts must look deeper to the longer term effects of the agreement to discover whether it is intended to harm competition:

It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts.

Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition.[31]

Because of the difficulty of proving intent, as well as the necessity of considering the long-term effects of a defendant's behavior, it would be natural to conclude then that proof of intent and proof of injury are closely related, and that the latter is inferential proof of the former. Professors Areeda and Hovenkamp reach just this conclusion:

It is often said that agreements do not offend the Sherman Act in the absence of a purpose or effect to restrain trade, or that a restraining agreement may be redeemed by a legitimate purpose. Such statements seem to call for inquiry into a defendant's state of mind. That inquiry often seems to invite the parties to examine thousands of documents, to depose nearly everyone, to resist early disposition on the ground that disputed intent requires trial, to burden the judge and jury with ambiguous evidence, and to invite decision on the basis of relative purity of heart rather than competitive impact.

These problems cannot be entirely avoided, because mental state is sometimes relevant, particularly when conduct is ambiguous. However, intent seldom determines reasonableness. Indeed, intent is often superfluous to the analysis of reason-

---

**26.** No one denies that there was an agreement between the two defendants. This agreement came in the form of the exclusive agreement between the Group and Providence, expanded in 1994 to include pain management services. No one disputes that such an exclusive contract for medical services is not in itself illegal or evidence of a conspiratorial intent. *Lee*, 999 P.2d at 762.

**27.** Providence and the Group essentially ask us to combine the first two elements of the restraint of trade prima facie case: i.e., whether (1) there was an agreement or conspiracy; and (2) whether the persons intended to harm or restrain competition. *Id.* at 762. As we detail below, we choose to expand this discussion to include considerations of the consequences of defendant's conduct, an often essential inquiry when considering proof of intent.

**28.** *See, e.g., SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 969–70 (10th Cir.1994); *Olympia*

*Equip. Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir.1986) ("Most businessmen don't like their competitors, or for that matter competition.... That is fine, however, so long as they do not use methods calculated to make consumers worse off in the long run."); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) ("If a firm has been attempting to exclude rivals on some basis other than efficiency it is fair to characterize its behavior as predatory.").

**29.** Phillip E. Areeda & Herbert Hovenkamp, VI Antitrust Law § 1400a (2d ed.2003).

**30.** *See* P. Areeda, VI Antitrust Law § 1400b (2d ed.2003).

**31.** *American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

ableness, for it adds nothing to the conduct from which it is usually inferred.[32]

As the United States Supreme Court has noted:

> Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. Where the conspiracy is proved, as here, from the evidence of the action taken in concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy. The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words.[33]

▪ Keeping these principles in mind, we conclude that there was evidence upon which a reasonable juror could decide defendants had an intent to harm competition. As discussed above, testimony indicated that numerous members of the Group, especially Norman, were not particularly fond of Chandler, and that some intended to put Chandler out of business; Borrello, too, was labeled by some in the Group as tainted because of his close association with Chandler. Other evidence suggested defendants' motives went beyond mere competition. Chandler's efforts to treat his patients at Providence—something he was permitted to do by the terms of the agreement—appeared at times to be frustrated by defendants' refusal to contact him. On at least one occasion hospital staff were prevented from calling Borrello to see one of Chandler's patients when it was evident that Chandler was out of town. A reasonable juror could piece together defendants' declarations with their actions and find intent to harm competition.

Appellants respond that this evidence only shows one-half of the picture, indicating at most that the Group wanted to drive Chandler out of business, and indicating nothing about Providence. They argue, "[w]ithout evidence showing that Providence 'knowingly became members of that conspiracy with the intent to further its purposes,' no conspiracy existed as a matter of law." [34]

▪ Unilateral conduct by a single entity is not actionable as an agreement in restraint of trade.[35] But the Group did not act unilaterally. The exclusive contracts were bilateral, and if they caused injury to competition, an inference of intent may be drawn against Providence as well as against the Group.

▪ The plaintiffs presented substantial evidence of harm to competition. In order to demonstrate harm to competition in an antitrust claim, a plaintiff must show proof of actual harm to competition reaching beyond mere harm to itself as a competitor.[36] Reduced output, decreased consumer welfare, and higher prices are all relevant considerations.[37] Unlike tort law, in antitrust law "the 'reasonableness' of a restraint is judged by its general effect on the market, not by the circumstances of a particular application." [38]

▪ With regard to consumer welfare, or quality of care, Chandler presented evidence which, when viewed in its best light, painted the following picture. The Group often had difficulty retaining chronic pain management specialists, resulting in understaffing, which, when coupled with the exclusive, meant patients had to needlessly suffer in pain. For example, the lack of availability of physicians, sometimes only amounting to one available physician, resulted in a lack of continuity among physicians, backlogs of patients and overall delays.[39] Other evidence suggested

---

**32.** P. Areeda, VII Antitrust Law § 1506 (2d ed.2003).

**33.** *American Tobacco,* 328 U.S. at 809–10, 66 S.Ct. 1125.

**34.** Appellants cite *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs. Inc.,* 996 F.2d 537, 545 (2d Cir.1993), for this proposition.

**35.** *Oltz,* 861 F.2d at 1449–50.

**36.** *See, e.g., Consol. Metal Prods., Inc. v. American Petroleum Inst.,* 846 F.2d 284, 292–93 (5th Cir. 1988).

**37.** *Id.*

**38.** *Id.* at 297.

**39.** One pain service clinician from Providence Hospital testified that patients had to sometimes wait up to eight hours for a consultation.

that the Group's pain doctors gave less priority to pain services than other forms of anesthesia. One former Providence nurse went so far as to agree that "the Group never developed the depth of staff to provide sufficient coverage for the pain service."

Evidence also suggested that medical knowledge within the Group was deficient: for extended periods certain pain management procedures, such as implantable pumps, were outside the realm of expertise of any of the Group's physicians. One doctor testified that Chandler had a very good set-up for implantable pumps and that he saw no reason why Chandler's practice should be restricted. A former pain service clinician from Providence testified: "People that needed further [pain treatment beyond steroid injections], I don't think that we have served their needs." Despite its purported inability to fully serve patients' needs, the Group and Providence continued to enforce the exclusive agreement. One nurse testified that she would have referred patients to Chandler and Borrello had she been allowed because it would have helped alleviate many of the understaffing and quality control problems Providence was experiencing.

Chandler presented other evidence suggesting that the Group "dumped" unprofitable patients, thereby decreasing consumer welfare and creating market barriers by saturating competitors with low-paying patients. One physician testified that his superiors instructed him to dump Medicare and Medicaid patients "by being too busy to see them." Chandler observed the effects on his own practice: the Group would neglect to follow up on cases when they became less profitable, and these patients would end up at Chandler's practice for the less-profitable re-evaluations.

Other evidence suggested that the Group's activities manipulated prices by "unbundling" procedures, making them more expensive and possibly less effective for patients. Unbundling can be described as the separation of a medical procedure into its parts, i.e., a number of separately billed sub-procedures which, in their totality, incur a greater total charge then if all were billed as one procedure.[40] Witnesses testified that one physician within the Group, Dr. Davy, proposed that a certain pain treatment be applied post-operatively so that he could charge more for it as a separate procedure. Though some objected that the proposal was not good patient care, at least one physician remembers his superiors "stat[ing] that that would be the policy from that point forward." One pain service clinician was told that doing the procedure post-operatively meant the patient could be billed additionally; on ten or more occasions she observed Davy or another doctor performing the procedure post-operatively. Other testimony suggested that others also were aware of this practice.[41]

■ In an effort to demonstrate a decrease in consumer welfare, Chandler refers to problems experienced by specific patients. Appellants counter that Chandler's anecdotal evidence fails to establish a baseline standard of care. Appellants' argument would be sound were Chandler solely relying on the stories of three out of several thousand patients; we note again that antitrust law considers general effects on the market rather than particular applications.[42] But here, a former Group doctor testified that, in his opinion, the exclusive contracts reduced choices to patients without any added benefit. Furthermore, as discussed above, Chandler

40. Several physicians testified that they felt unbundling was unethical and at times could be even illegal (such as when Medicare or Medicaid was involved).

41. The Group objects to this evidence because the procedure in question "is part of *acute* pain management, and not *chronic* pain management at issue in this case." Regardless, other evidence demonstrated that Davy's duties included oversight of the chronic pain management service at issue, and his salary package regarding these duties included incentives for profitability

of the pain clinic. One physician observed of Davy generally, "[m]y understanding was that he was indifferent to whether the patients had pain or not, as long as he was able to charge for it." Another observed that Davy was eventually fired because of billing irregularities and the quality of his operating room care.

42. *See Consol. Metal Prods.*, 846 F.2d at 297 (measuring reasonableness of restraint by general effects on market rather than circumstances of particular application).

presented evidence of serious understaffing in the Group. Chandler also presented relevant testimony demonstrating that one or more members of the Group were motivated more by profit concerns than with patients' pain. It is with this evidence in mind that the three patients' stories might be of use to a juror as illustrative of the adverse consequences of the Group's exclusive contract with Providence.

In summary, we conclude that the evidence was sufficient to satisfy each element of Chandler's restraint of trade claim.

### Appeal Issue 4 Was the evidence sufficient to warrant an award of lost profits to the plaintiffs?

In connection with their antitrust claims for restraint of trade, Chandler and Borrello requested damages in the form of lost profits and lost income, respectively,[43] resulting from the exclusive contract between Providence and the Group. They relied on their expert, economist Dr. Bradford Tuck, to estimate the extent of three sources of loss: (1) losses stemming from Borrello's exclusion from Providence and/or his inability to freely treat patients there; (2) losses resulting from a loss of pain management patient referrals due to interference by Providence; and (3) losses resulting from the referral of only Medicare, Medicaid and other low paying or nonpaying patients.[44]

After two failed directed verdict motions and a jury verdict in favor of Borrello and Chandler with regard to the lost profits claim, the defendants moved for j.n.o.v. The court again rejected defense arguments. The court did however inquire as to the correct measure of corporate profits for professional corporations, i.e., whether or not to consider employee/shareholder salaries and other compensation as income or expenses.

Noting a split in authority, the court sided with plaintiffs' measure, reasoning "if a professional corporation could not prove lost profits via salary compensation, then it would never be able to prove damages for lost profits if the wrongful act of another caused it harm."

Providence and the Group renew all of their arguments on appeal.

They first argue that Tuck did not calculate "lost profits" for Chandler's corporation A.A. Pain correctly. They point out that while A.A. Pain's total income increased by seventy-two percent between 1995 and 1998, its corporate profits *decreased* each of those years because the doctors were receiving increased salaries and other compensation. They argue that damages should have been assessed according to the average profit margin over the four years, here approximately 1.06%, a figure which would have greatly reduced Chandler's measure of damages.

Chandler's witness Tuck utilized a different margin, one that *included* the salaries and "other compensation" of the doctors in the corporate profits/losses category. Chandler argues that this was appropriate under the circumstances because, like most professionals who are both shareholders of their professional corporation and employees of that same corporation, he avoids double taxation by compensating himself with a salary taken from the corporation's pre-tax revenues. In this way corporate net income is kept to a minimum and only Chandler personally is taxed. But Chandler contends that this unnaturally low figure would not be a good basis for his damages award because it does not reflect the corporation's actual financial condition.

No Alaska authority effectively deals with this issue.[45] In examining other

---

**43.** Chandler sought lost profits because he was suing in the name of his corporation, A.A. Pain.

**44.** Tuck estimated that Chandler would have received $351,523 more in compensation between 1996 and 1998 but for the restrictions on the practice of Borrello, $252,468 more in compensation between 1995 and 1998 but for the prohibition on patient referrals to Chandler or Borrello, and $627,681 more in compensation between 1995 and 1998 but for the "dumping" of Medi-

care patients. In all, this amounted to $1,231,672 in total estimated lost profits.

**45.** Questions of law are reviewed de novo; under this standard, it is this court's duty "to adopt the rule of law that is most persuasive in light of precedent, reason, and policy." *Langdon v. Champion*, 752 P.2d 999, 1001 (Alaska 1988) (quoting *Brooks v. Brooks*, 733 P.2d 1044, 1055 (Alaska 1987)).

jurisdictions, it is apparent that there is a split in authority. *Anesthesiologists Associates of Ogden v. St. Benedict's Hospital*[46] effectively represents Providence's argument that salaries in a professional corporation should be treated as saved expenses for purposes of lost profits. There the Supreme Court of Utah held that shareholders of a professional organization make a choice to reap the many benefits of incorporation, such as limited liability.[47] "In so doing, they [assume] all the attendant advantages as well as the disadvantages of the corporate form. One of the disadvantages of doing business as a corporation is that losses suffered by individual doctors cannot be recovered by the corporation."[48] In essence, then, this line of authority refuses to treat professional corporations as different from other corporations.[49]

*Bettius & Sanderson, P.C. v. National Union Fire Insurance Co.* represents the opposite view.[50] Citing the difference in corporate structure which distinguishes a professional corporation from the more traditional corporation, the Fourth Circuit concluded that eliminating salary compensation from the lost profits calculation for professional corporations would make it virtually impossible to ever prove damages.[51] This would result in an unrealistic picture of corporate profits and an injustice to the professional shareholder.[52] The court elaborated that one distinguishing mark of a professional corporation is that its shareholders actually earn their compensation through services rendered rather than through ownership.[53] As a result the corporation ends up calculating its net income with different goals in mind.[54]

In our opinion, the *Bettius* line of thinking better reflects actual losses of a professional corporation. It prevents a situation where a wrongdoer can avoid liability simply because of a technicality in the corporate structure. We conclude therefore that the superior court did not err in adopting the *Bettius* approach.

██ We next turn to the sufficiency of the evidence. "[L]ost profits must be proven with reasonable certainty."[55] For all three of their lost profits theories, Chandler and Borrello rely almost exclusively on their own testimony coupled with the conclusions of Tuck, which Providence and the Group assert are nothing more than a series of "assumptions" relayed to him by the doctors' own self-serving testimony.

Appellants question several of Tuck's assumptions. First, with regard to Borrello's practice, Tuck assumed that the addition of a second doctor to a clinic should have doubled gross receipts within six months. Appellants argue that more evidence was necessary since both doctors "always [had] work to do" and were both attempting to shift their practices in other directions.

With regard to referrals, Tuck assumed that, because Chandler told him he observed a twenty percent decrease in clinic income or billings during the exclusive, A.A. Pain's figures during the exclusive would have been twenty percent higher, absent the restraint.[56] But Chandler testified in court that he had no idea how many referrals his clinic received before or during the time the exclusive contract was in effect.

With regard to the Medicare and Medicaid patients, Tuck admitted that he had not conducted any independent research on the mat-

---

46. 884 P.2d 1236 (Utah 1994).

47. *Id.* at 1240.

48. *Id.*

49. *Id.* at 1240–41.

50. 839 F.2d 1009 (4th Cir.1988).

51. *Id.* at 1013.

52. *Id.*

53. *Id.* at 1014.

54. *Id.* at 1013–14.

55. *Geolar, Inc. v. Gilbert/Commonwealth, Inc.*, 874 P.2d 937, 946 (Alaska 1994).

56. Tuck's math appears to be faulty. After a 20% decline of profits, profits would be 4/5 of pre-decline profits. To regain the pre-decline profits would take a 25% increase (4/5 * 5/4 = 1).

ter, relying instead solely on Chandler and Borrello's estimates.[57]

■ The applicable standard is that "[t]he evidence must afford sufficient data from which the court or jury may properly estimate the amount of damages, which data shall be established by facts rather than by mere conclusions of witnesses."[58] Were only Tuck's testimony available, the evidence might be insufficient to meet this standard.

■ But other evidence exists. Appellants' own witnesses and documents provided support: in particular, preliminary estimates made by the hospital as to how much revenue its proposed pain service would generate, and the testimony of two doctors who were able to build their successful pain service practices in a relatively short time. Such data also demonstrated the Group's own caseload around the time of the exclusive. A juror could have compared this to Borrello and Chandler's own caseload. In addition, Chandler's estimated percentage of Medicare and Medicaid patients were substantially higher than the Group's; this is significant when coupled with evidence of the Group's patient-screening practices and its "dumping" of unprofitable patients. Given this corroborative evidence, a juror's finding consistent with Tuck's testimony would be reasonable.

**Appeal Issue 5 Was the award of attorney's fees to both Chandler and Borrello under the antitrust act erroneous because only Chandler prevailed on an antitrust theory?**

The Alaska antitrust statute, AS 45.50.576(a)(1), establishes that prevailing parties are entitled to full, reasonable attorney's fees.[59] Alaska Rule of Civil Procedure 82(b)(1) only allows for partial attorney's fee recovery.

Because some of his prevailing claims were under the antitrust statute, Chandler asked for full reasonable attorney's fees. Because he did not prevail on any antitrust claim and only recovered on common law claims, Borrello sought a partial award under Civil Rule 82.[60]

Appellants' sole contention is that the superior court erred in awarding Borrello attorney's fees under the Alaska Antitrust Act when he did not prevail on any of his antitrust claims.

■ We agree that the superior court abused its discretion in awarding Borrello full reasonable attorney's fees.[61] Because Borrello only prevailed on common law claims, he was not entitled to recovery under the full reasonable fees standard of AS 45.50.576(a)(1). Rather, under Rule 82, he was only entitled to an award of partial fees. Further, since he only prevailed on common law claims against the Group, his Rule 82 award should only run against the Group, and not Providence. The superior court exceeded its "bounds of broad discretion"[62] in awarding Borrello fees that could only be justified by a claim on which he did not prevail, and against a defendant against whom he did not prevail.

57. Tuck surmised that he could not have investigated patients' records because billing records were purged from the computer system every year.

58. *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 223 (Alaska 1978) (quoting *Levene v. City of Salem*, 191 Or. 182, 229 P.2d 255, 263 (1951)).

59. AS 45.50.576(a) provides in part:

A person who is injured in business or property by a violation of AS 45.50.562—45.50.570 ... may bring a civil action (1) for damages sustained by the person, and if the judgment is for the plaintiff and the trier of fact finds that the defendant's conduct was wilful, the plaintiff shall be awarded threefold the amount of damages sustained by the person, plus the costs of the suit including reasonable attorney fees[.]

60. Borrello sought $47,822, a reduction of $108,294 from his alleged incurred fees (based on a 40/60 division between him and Chandler, respectively).

61. This court reviews a trial court's award of attorney's fees for an abuse of discretion. *Davila v. Davila*, 908 P.2d 1027, 1031 (Alaska 1995).

62. *Blackford v. Taggart*, 672 P.2d 888, 891 (Alaska 1983).

**Cross–Appeal Issue 1 Did the court err in granting j.n.o.v. in favor of APMC and Providence on Chandler's claim of intentional interference with contractual relations?**

Chandler alleged that Providence, the Group, and APMC interfered with Chandler's contract with S.H. when they canceled her procedure so as to move it off-site. In part because those acts required him to obtain a temporary restraining order to perform the procedure as scheduled, Chandler asked for damages "[i]n an amount in excess of $50,000.00, to be proven at trial."

At trial, the only evidence regarding damages on this issue came from Chandler's and Borrello's own testimony describing discussions between themselves and S.H.'s family about how to proceed in light of the cancellation, as well as their subsequent attempts to get the restraining order:

> [W]e called our attorney, which was Stan Lewis, and I met with Stan and told him the situation. We went to his office in the afternoon, after we had met with [the patient's husband]. And we were up the entire night preparing the documents. He pulled in the whole staff, and the documents were prepared for the next morning in court.

The jury found Providence, the Group, and APMC liable to Chandler for interfering with his contract with patient S.H., awarding damages of $146,240 against APMC, and $292,480 against Providence. Subsequently, the defendants moved for j.n.o.v., arguing that Chandler had not presented any evidence of damages arising from contractual interference. The superior court agreed that there was insufficient evidence to justify that claim.

Chandler argues that the record reflects sufficient injury since he had to both hire a lawyer and work all night to prepare paperwork to file the eventually successful restraining order.[63] Alternatively, Chandler asks for nominal damages in order to negate APMC's prevailing-party status and avoid the consequential attorney's fees award. Chandler cites *Grant v. Stoyer* for the proposition that the court cannot award zero damages when it is "beyond legitimate controversy" that there was a compensable injury.[64]

■ The rule of law is clear that attorney's fees for work in the case under review are not recoverable as damages.[65] Thus, Lewis's fees cannot be considered a part of a damage award. Neither should the superior court consider Chandler's time spent actually preparing this litigation.[66]

■ However, the cancellation and rescheduling of the procedure led to a disruption in Chandler's professional schedule apart from litigation preparation. Although not specifically quantified, this loss of professional time is without question a compensable injury,[67] entitling Chandler to at least nomi-

**63.** Procedurally, Chandler also argues that defense never moved for directed verdict on this particular issue of damages, and thus was barred the right to seek a j.n.o.v. Alaska Civil Rule 50(a), describing motions for directed verdicts, simply requires that the motion "shall state the specific grounds therefor." The record demonstrates that Providence and the Group moved for directed verdict on "all damage claims." As opposed to our federal counterpart, which requires the motion to raise both the law *and the facts* on which the moving party is entitled to judgment, Federal Rule of Civil Procedure 50(a)(2), this court simply looks to whether or not the party moving for j.n.o.v. made an adequate motion as to the grounds for directed verdict. *See, e.g., Metcalf v. Wilbur, Inc.,* 645 P.2d 163, 170 (Alaska 1982). Here that requirement was met.

**64.** 10 P.3d 594, 599 (Alaska 2000).

**65.** *Fairbanks Fire Fighters Ass'n, Local 1324, Int'l Ass'n of Fire Fighters v. City of Fairbanks,* 934 P.2d 759, 761–62 & n. 5 (Alaska 1997); *Ehredt v. DeHavilland Aircraft Co.,* 705 P.2d 446, 452 n. 8 (Alaska 1985).

**66.** *Curt's Trucking Co. v. City of Anchorage,* 578 P.2d 975, 981 (Alaska 1978).

**67.** *See, e.g., State v. Stanley,* 506 P.2d 1284, 1293 (Alaska 1973) (allowing shipowner to recover for lost earnings, citing basic principle of tort damages that "an injured person is entitled to be replaced as nearly as possible in the position he would have occupied had it not been for the defendant's tort"); *Miller Indus. v. Caterpillar Tractor Co.,* 733 F.2d 813, 818–20 (11th Cir. 1984) (allowing crew members to recover for lost wages which were dependent on tortiously incapacitated vessel's catch); *Kisor v. Tulsa Rendering Co.,* 113 F.Supp. 10, 19 (W.D.Ark.1953) (al-

nal damages. We therefore reverse the superior court on this issue and remand for entry of a nominal damage award in favor of Chandler on this claim.

In view of this disposition, the superior court on remand should reconsider whether APMC is still the prevailing party with regard to Chandler's claim.

**Cross–Appeal Issue 2 Did the court err in granting j.n.o.v. in favor of Providence on A.A. Pain's claim of violation of the implied covenant of good faith and fair dealing on the ground that Providence's contract was with Chandler rather than A.A. Pain?**

Citing the hospital privileges agreement between Chandler and Providence and the limited privileges afforded to Borrello, Chandler and Borrello argued at trial that Providence's actions during the exclusive violated the covenant of good faith and fair dealing.

The jury decided against Borrello but in favor of Chandler. Providence moved for j.n.o.v., arguing that in order to prove a breach of the covenant of good faith and fair dealing, one must preliminarily prove the existence of a contract. Providence contended that A.A. Pain "never produced any evidence of a contract between Providence and A.A. Pain Clinic, and it is undisputed that no such contract ever existed." Given that Chandler was suing in the name of A.A. Pain rather than personally, whereas his privileges at the hospital were personal, Providence argued that A.A. Pain was not entitled to maintain this claim. The superior court granted Providence's motion, reasoning that because no contract existed between A.A. Pain and Providence, there could be no breach of the covenant of good faith and fair dealing.

Chandler argues that the superior court erred because it failed to consider that a party who contracts with an agent may be held directly liable to the agent's principal for breach of that contract. Chandler relies on section 292 of the Restatement (Second) of Agency, regarding disclosed agency:

> The other party to a contract made by an agent for a disclosed or partially disclosed principal, *acting within his authority, apparent authority or other agency power,* is liable to the principal as if he had contracted directly with the principal, unless the principal is excluded as a party by the form or terms of the contract.[68]

Comment (a) to section 292 adds that "a principal may be bound as a party to such a transaction even though the other party did not enter into it in reliance upon the appearance of authority in the agent." [69]

Providence argues that the above rules have no application because there is no evidence that Chandler was acting as an agent for A.A. Pain when he "contracted" for his privileges at Providence. Providence notes that A.A. Pain was not incorporated until 1994, more than twenty years after Chandler received his privileges at Providence. Regarding the 1995 Letter of Understanding, which purported not to "reduce Dr. Chandler's existing practice," Providence argues that the language—never mentioning A.A. Pain—simply stresses the continuity of the privileges agreement personal to Chandler.

Before the drafting of the 1995 Letter of Understanding, Chandler wrote two letters to Dr. Norman of the Group, seeking to delineate the scope of his privileges under the 1994 exclusive. These letters were also provided to Providence Hospital. The letters were on A.A. Pain stationary and list Chandler as A.A. Pain's Medical Director. Chandler elicited testimony at trial showing that these letters led directly to the drafting of the Letter of Understanding. Again, viewing the evidence in the light most favorable to Chandler, we find there was sufficient evidence that A.A. Pain was a known principal

lowing personal injury victim to recover for loss of time); *Denco Bus Lines, Inc. v. Hargis,* 204 Okla. 339, 229 P.2d 560, 562 (Okla.1951) (listing loss of work time and consequent loss of earnings as part of pecuniary loss).

**68.** Restatement (Second) of Agency § 292 (1957) (emphasis added).

**69.** *Id.* at cmt. (a).

when the 1995 Letter of Understanding was drafted.

 It is uncontested that Chandler, in practicing chronic pain management at Providence, did so as an employee of A.A. Pain. In Alaska a physician may practice through a professional corporation, and when this occurs the professional corporation, as well as the physician, is considered to be rendering the professional services.[70] Providence knew that Chandler was practicing through A.A. Pain, and when Providence breached Chandler's contractual privileges it knew or should have known that this hindered his performance as an employee of A.A. Pain. It does no damage to established principles of law to allow A.A. Pain to sue for the loss thereby suffered. Just as a professional corporation may recover as damages for lost profits lost compensation to its principals,[71] it should be entitled to recover as damages earnings losses suffered by its principals. We therefore conclude that A.A. Pain had the right to sue for the breach of Chandler's hospital privileges. We thus reverse the superior court on this issue.

### Cross–Appeal Issue 3 Did the court err in awarding prevailing party attorney's fees of $33,183.35 to APMC?

 The only jury verdict not in favor of APMC was on Chandler's claim for interference with contract. This verdict was subsequently overturned by the superior court's grant of j.n.o.v. As a result, the superior court deemed APMC to be a prevailing party and, over objection, granted it attorney's fees of $33,183.25 against both Chandler and Borrello. The award against Chandler should be reconsidered in light of our holding that Chandler was at least entitled to nominal damages on his claim against APMC. The discussion that follows applies to the award against Borrello and may apply to Chandler if the superior court concludes that APMC

was the prevailing party on Chandler's claim despite his nominal award.

APMC, because of an indemnification agreement with Providence, was not obligated to pay for its own attorney's fees. As justification for granting attorney's fees, the superior court relied on *Gregory v. Sauser*[72] and Civil Rule 82. The superior court explained:

> Civil Rule 82 mandates the award of attorney's fees to the prevailing party. The fact that a particular defendant or plaintiff did not pay for any attorney's fees out [of] his own pocket does not affect that individual's right to attorney's fees. In discussing whether Civil Rule 82 attorney's fees should be awarded in cases where a party did not have an obligation to pay for those services, the Alaska Supreme Court has stated "any further distinction, based upon whether the client has an obligation to pay for the legal services rendered, is untenable." Therefore, the fact that APMC did not have [an] obligation to pay for attorney's fees is not relevant to its right to recover attorney's fees.

(Citations omitted.)

Chandler and Borrello argue that, though *Gregory* should indeed be applicable to cases where a party's attorney is provided through legal aid or is paid by an insurer, "where the party's attorney is provided and paid by a non-prevailing party, a different rule should apply." (Emphasis omitted.) They cite no authority for this proposition. Instead, they request that in the interest of justice a wrongdoer should not be able to benefit from such awards.

 The trial court retains a great amount of discretion both in deciding whether or not to characterize a party as "prevailing" for purposes of awarding attorney's fees and in deciding whether or not to actually award a prevailing party attorney's fees.[73]

---

**70.** *See* AS 10.45.020–.030; AS 10.45.140(a).

**71.** *See supra* discussion at pp. 1005–1007 and *Bettius & Sanderson, P.C. v. Nat'l Union Fire Ins. Co.,* 839 F.2d 1009, 1013–14 (4th Cir.1988).

**72.** 574 P.2d 445 (Alaska 1978).

**73.** *Tobeluk v. Lind,* 589 P.2d 873, 878 (Alaska 1979); *Davidsen v. Kirkland,* 362 P.2d 1068, 1070 (Alaska 1961).

This court has held that Rule 82 should be construed to allow awards of attorney's fee to any "party" who qualifies for the fee under the terms of the rule.[74] Parties who are served by in-house counsel, legal services, and insurance indemnification are all put "on the same footing as other litigants."[75]

Chandler and Borrello do not contest the fact that APMC was a separate and distinct party in this litigation. Instead, they simply assert that attorney's fees should not have been awarded because the effect is that a nonprevailing party who agreed to indemnify a prevailing party will ultimately benefit. Though Chandler and Borrello are correct when they assert that a court *may* deny a prevailing party fees provided an explanation is given, it is clear that such an option is discretionary, not mandatory.[76] In this instance we do not find sufficient grounds for concluding that the superior court abused its discretion.

We therefore affirm the superior court's award of fees to APMC as against Borrello.

## CONCLUSION

In summary, all of Chandler's judgments against Providence and the Group including the award of attorney's fees are AFFIRMED. Borrello's judgment against the Group is AFFIRMED. The award of full reasonable fees in favor of Borrello against Providence and the Group is REVERSED. On REMAND Borrello should be awarded fees under Civil Rule 82 against the Group, but not against Providence. J.n.o.v. in favor of Providence on Chandler's award of $292,480 in damages on his claim of breach of the covenant of good faith and fair dealing is REVERSED. J.n.o.v. in favor of APMC and Providence on Chandler's claim for intentional interference with contractual relations is REVERSED; on REMAND the court should enter an award of nominal damages in favor of Chandler and consider whether APMC is still the prevailing party on this claim. The award of attorney's fees in favor of APMC is AFFIRMED as against Borrello and VACATED as to Chandler. If the court concludes that APMC is still the prevailing party as against Chandler the award may be reinstated.

AFFIRMED in part, REVERSED and VACATED in part, and REMANDED for further proceedings consistent with this opinion.

BRYNER, Justice, not participating.

---

**74.** *Greater Anchorage Area Borough v. Sisters of Charity of House of Providence,* 573 P.2d 862, 863 (Alaska 1978).

**75.** *Id.; see also Gregory,* 574 P.2d at 445.

**76.** *See Hansen v. Stroecker,* 699 P.2d 871, 875 (Alaska 1985).